409 F.3d 100
 George NEILSON, Plaintiff-Appellee,
v.
Anthony D'ANGELIS, Chief Clerk of the New York State Supreme Court, Queens County and Louis Bianculli, Major of Court Officers, Defendants-Appellants,
Anthony Delgado, Captain of Court Officers, Bruce Markowitz, Sergeant of Court Officers, John Does 1 Through 5, the individual defendants being sued in their individual and official capacities and State of New York, Defendants.
 Docket No. 03-9074(L).
 Docket No. 003-9158(CON).
 United States Court of Appeals, Second Circuit.
 Argued: October 26, 2004.
 Decided: May 26, 2005.
 
 Jean Lin, Assistant Solicitor General (Eliot Spitzer, Attorney General of the State of New York, and Marion Buchbinder, Senior Assistant Solicitor General, on the brief), New York, New York, for Defendants-Appellants.
 Richard J. Cardinale, Cardinale Hueston & Marinelli, New York, New York, for Plaintiff-Appellee.
 Before: WINTER, KATZMANN, AND RAGGI, Circuit Judges.
 WINTER, Circuit Judge.
 
 
 1
 Plaintiff-appellee George Neilson is a senior court officer employed by the Office of Court Administration of the Supreme Court in Queens County, New York. Neilson was disciplined for unholstering his gun in the presence of a cleaning person and failing to report the incident truthfully. Neilson then brought suit against several people, including his supervisors, Louis Bianculli and Anthony D'Angelis. After a jury trial before Judge Sifton, Neilson prevailed on the Equal Protection "class of one" claim he brought against appellants Bianculli and D'Angelis. The district court denied appellants' subsequent motion for judgment as a matter of law. Bianculli and D'Angelis now appeal. We hold that Neilson did not, as a matter of law, satisfy the similarly situated requirement of an Equal Protection "class of one" claim. Accordingly, we reverse.
 
 BACKGROUND
 
 2
 On October 11, 2000, Neilson brought the present action in the Eastern District alleging, among other things, that Bianculli and D'Angelis had violated his equal protection rights under the Fourteenth Amendment. He claimed that he was treated differently and more harshly than other court officers who engaged in workplace misconduct but were not subjected to any type of formal disciplinary charges. The case proceeded to trial.
 
 
 3
 The evidence showed the following. As a senior court officer, Neilson performs duties similar to a police officer. On March 20, 2000, at approximately 10 p.m., Neilson was patrolling the Kew Gardens courthouse in Queens when he encountered Louis Cortez, a cleaning person for the district attorney's office. Cortez was not in uniform, but he explained that he was a porter and produced identification for Neilson's inspection. Cortez's identification card had expired, but Neilson testified that he was not alarmed because he knew that new identification cards had not yet been issued.
 
 
 4
 What transpired next is in dispute, although, given the jury's verdict, we must view the record in the light most favorable to Neilson. Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2d Cir.2000). Neilson contends that he observed Cortez without incident before continuing his search of the building. Nonetheless, later that evening, Neilson reported his encounter with Cortez to his Sergeant, Robert Norwood. Based upon Neilson's description of the encounter as unremarkable, Norwood advised Neilson that it was unnecessary to file an incident report about it. Even so, Neilson made a notation in his night patrol log, "grand jury open, d.a. porter Louis Cortez working."
 
 
 5
 At the time Neilson told Sergeant Norwood about Cortez, another senior court officer, Robert Murphy, was present. Neilson claims that Murphy asked him in a joking manner whether he drew his firearm on Cortez and that Neilson responded, "No, of course not." Murphy stated in a later interview with appellant Bianculli, a captain of court officers, however, that Neilson spontaneously raised the weapon issue and denied that he drew the firearm. In any event, it is undisputed that Neilson specifically denied drawing his firearm on Cortez.
 
 
 6
 The following day Cortez told his supervisors that Neilson had unholstered his gun, cocked it, and pointed it at him. Cortez claimed that Neilson had told him "I am not going home in a body bag" and "I have my gun pointed at you." The incident was reported to appellant Bianculli. Bianculli raised the complaint with Neilson, and Neilson again denied drawing his firearm in the encounter with Cortez. Bianculli notified his supervisor, the Chief Clerk of the Queens County Supreme Court, appellant D'Angelis, of Cortez's complaint. D'Angelis reported the incident to his immediate supervisor, the Administrative Judge of Queens County Supreme Court, the Honorable Steven W. Fisher. He also reported the incident to the office of the Honorable Joan B. Carey, Deputy Chief Administrative Judge of the New York City courts. Judge Carey supervises all the courthouses in all boroughs of New York City and oversees the discipline of court officers.
 
 
 7
 A report of the incident involving Neilson was additionally forwarded to the Inspector General of the Office of Court Administration. Judge Carey testified that only the more serious cases are referred to the Inspector General. The Inspector General at the time of Cortez's complaint testified that the office reviews "allegations of acts of malfeasance, misfeasance or nonfeasance on the part of the nonjudicial employees of the court system" and recommends further action to the appropriate Administrative Judge, in this case Judge Carey. An investigation followed, in which the Inspector General's office reviewed the reports filed by, and interviews of, those persons involved in the incident, including Cortez, who continued to insist that Neilson had drawn a gun on him, and Neilson, who insisted that he had not. At the conclusion of the investigation, the Inspector General recommended that Neilson be "brought up on charges, seeking his termination."
 
 
 8
 Based on the Inspector General's recommendation, Judge Carey filed formal charges against Neilson, which, pursuant to the governing collective bargaining agreement, required that Neilson be afforded an evidentiary hearing. In accordance with the agreement, Judge Carey appointed the hearing officer, selecting a retired New York Supreme Court Justice. After hearing testimony from Neilson and Cortez, among others, the hearing officer found that Neilson had not threatened Cortez with his gun but that he had (justifiably) unholstered his firearm and, thus, had not reported the incident truthfully to his supervisors. The hearing officer concluded that Neilson's failure truthfully to acknowledge unholstering his gun had persisted through the evidentiary hearing. Consequently, the hearing officer recommended that Neilson be suspended without pay for the period of one week. Judge Carey subsequently adopted the hearing officer's findings and recommendation.
 
 
 9
 At trial, Neilson sought, inter alia, to sustain his Equal Protection "class of one" claim of being singled out for differential treatment by comparing his discipline to lesser sanctions imposed on other court officers in connection with other allegedly similar incidents. One of those officers, John Doe 2, reported to work at a firing range for his annual weapon requalification intoxicated. Immediately after the incident, John Doe 2 met with Bianculli to discuss it. Bianculli subsequently sent D'Angelis a memorandum regarding the incident in which he indicated that John Doe 2 admitted that he had been drinking and that he had a drinking problem. The memorandum also stated that John Doe 2 agreed to seek any help available to him, Bianculli's recommendation being entry into an inpatient alcohol program. The day after John Doe 2 reported to work intoxicated, he voluntarily entered a 28-day inpatient residential program for treatment of alcoholism. D'Angelis forwarded Bianculli's memorandum regarding John Doe 2 to Judge Carey and told her of John Doe 2's program placement. Judge Carey testified that she was notified "through paperwork" that John Doe 2 "reported for duty while intoxicated." John Doe 2 was never subject to formal disciplinary proceedings.
 
 
 10
 At trial Neilson also compared his treatment with that accorded John Doe 4, who engaged in the unauthorized use of a co-worker's credit card number to place six telephone calls from the Long Island City courthouse to a phone sex line, charging a total of $360.62. John Doe 4 subsequently reimbursed his co-worker who, satisfied with such resolution, declined to press charges against John Doe 4. D'Angelis[1] was notified of the incident, and he testified that he in turn consulted with the then-Administrative Judge by telephone. John Doe 4 accepted a rank demotion from sergeant to senior court officer, resulting in a substantial diminution in salary. D'Angelis testified at trial that he did not seek to have formal charges brought against John Doe 4.
 
 
 11
 The jury returned a verdict for Neilson on his Section 1983 claim against Bianculli and D'Angelis for selective treatment. Specifically, the jury found that: (i) appellants treated John Does 2 and 4 more leniently than Neilson, (ii) appellants' differential treatment of Neilson was without any rational basis, but that (iii) appellants acted without malice. The jury awarded Neilson $1200 in past lost wages; $4000 in future lost wages for two years; and $11,600 for emotional and mental distress for two years. A judgment totaling $23,200 was entered for Neilson on November 25, 2003.
 
 
 12
 Pursuant to Rule 50(b) and 59 of the Federal Rules of Civil Procedure, appellants moved for judgment as a matter of law, or in the alternative, for a new trial. The district court denied appellants' motions. On appeal, appellants argue that Neilson and John Does 2 and 4 were not similarly situated as a matter of law, and that even if they were, there was a rational basis for Neilson's differential treatment.
 
 DISCUSSION
 
 13
 We review de novo a district court's denial of a motion for judgment as a matter of law. Diesel, 232 F.3d at 103. A district court may grant a motion for a judgment as a matter of law only if "without weighing the credibility of the witnesses or otherwise considering the weight of the evidence," the evidence is such that reasonable persons could have reached only one conclusion as to the verdict. This is Me, Inc. v. Taylor, 157 F.3d 139, 142 (2d Cir.1998) (internal quotation marks and citations omitted). "Weakness of the evidence does not justify judgment as a matter of law; ... the evidence must be such that a reasonable juror would have been compelled to accept the view of the moving party." Id. (internal quotation marks and citation omitted).
 
 
 14
 With these standards in mind, we turn to the merits. Neilson claimed, and the jury found, that Bianculli and D'Angelis treated Neilson differently in violation of the Equal Protection Clause of the Fourteenth Amendment. "The Equal Protection Clause requires that the government treat all similarly situated people alike." Harlen Assocs. v. Inc. Village of Mineola, 273 F.3d 494, 499 (2d Cir.2001). While the Equal Protection Clause is most commonly used to bring claims alleging discrimination based on membership in a protected class, where, as here, the plaintiff does not allege membership in such a class, he or she can still prevail in what is known as a "class of one" equal protection claim. See Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam) (a valid equal protection claim may be brought by a "class of one" "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."); see also DeMuria v. Hawkes, 328 F.3d 704, 706 (2d Cir.2003).
 
 
 15
 In order to succeed on a "class of one" claim, the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high. See Purze v. Village of Winthrop Harbor, 286 F.3d 452, 455 (7th Cir.2002) ("In order to succeed, the [plaintiffs] must demonstrate that they were treated differently than someone who is prima facie identical in all relevant respects."). The parties in this case, however, appear to assume that the standard of "similarity" in "class of one" cases is analogous to that used in cases where discrimination based on membership in a specific protected class is claimed.[2] See Appellants' Br. at 25 (using similarity standard from Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir.2000), a Title VII case based on racial discrimination in employment); Appellee's Br. at 14 (same). That analogy has flaws. To be sure, where a plaintiff claims, for example, racial discrimination in employment, the plaintiff may present evidence of the treatment of employees of other races as a basis for the trier of fact to infer that the differing treatment meted out to the plaintiff was based on race. Graham, 230 F.3d at 39. The first legal question that arises in such cases is whether the similarity between the circumstances of the plaintiff and those of the comparators tends to prove that race was a factor in the differing treatment. Id. at 38-39. If so, evidence of the treatment of employees of other races is admissible. See Fed.R.Evid. 401 (relevant evidence is that "having any tendency to make the existence of any fact... of consequence to the determination of the action" more or less probable); Fed.R.Evid. 402 (relevant evidence is generally admissible). The second legal question is whether the similarity of circumstances and differential treatment of the plaintiff is, along with all the other evidence including at the least the race of the decision-maker and other employees involved, sufficient to make out a prima facie case of racial discrimination. Graham, 230 F.3d at 38-39. When those two issues are resolved in the plaintiff's favor, a trier of fact may—not must—find impermissible racial discrimination. Id. at 38.
 
 
 16
 When, as in the present case, a plaintiff seeks to prevail in a "class of one" equal protection case based on similar circumstances alone, the analysis is rather different. In such a "class of one" case, the treatment of persons in similar circumstances is not offered to provide, along with other evidence, an evidentiary inference of the use of particular impermissible factors. In such a "class of one" case, the existence of persons in similar circumstances who received more favorable treatment than the plaintiff is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain. See Olech, 528 U.S. at 565, 120 S.Ct. 1073.
 
 
 17
 The similarity and equal protection inquiries are thus virtually one and the same in such a "class of one" case, and the standard for determining whether another person's circumstances are similar to the plaintiff's must be, as Purze states, whether they are "prima facie identical." 286 F.3d at 455. We deem that test to require a plaintiff in such a "class of one" case to show that: (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake. See Olech, 528 U.S. at 565, 120 S.Ct. 1073 (Singling out must be "intentional[].").[3]
 
 
 18
 Where a plaintiff in a class of one equal protection case relies on similarity alone, a more stringent standard must be applied than is applied in a racial discrimination case. Otherwise, the plaintiff in the former will perversely find it easier to perform an illegal act than in the latter. A finding of general "similarity" alone would do the trick in the "class of one" case, even where the differential treatment was the result of a good faith disagreement as to governmental interests or simple negligence, while a finding of racial motive based on the entire record would be needed in the employment discrimination case. The standard of similarity in such a "class of one" equal protection case cannot be one under which persons who believe they may have suffered racial discrimination would find it to their legal benefit to abandon the race claim—the core of equal protection—in order to argue that they are a "class of one."
 
 
 19
 Neilson's evidence simply does not meet the relevant test for similarity. First, there was nothing irrational or unreasonable in finding that Neilson did unholster his weapon in the course of his encounter with Cortez and falsely reported the incident. Second, the comparisons to John Does 2 and 4 are far too remote. To be sure, they committed offenses that some rational people might deem as or more serious than Neilson's offense. However, other rational people might regard them as less serious in light of the potential danger to Cortez from Neilson's unholstering of his weapon. Moreover, John Does 2 and 4 immediately admitted their wrongdoing and voluntarily accepted the consequences of their actions, while Neilson falsely reported the Cortez incident, thereby triggering the disciplinary process that is the very basis for his claim. Because we conclude as a matter of law that a rational person could have imposed the different sanctions accorded Neilson and John Does 2 and 4, Neilson's claim necessarily fails as a matter of law notwithstanding the jury's verdict.
 
 CONCLUSION
 
 20
 For the reasons stated above, the judgment of the district court is reversed.
 
 
 
 Notes:
 
 
 [1]
 Because Bianculli was not involved in John Doe 4's discipline, the incident involving John Doe 4 was introduced solely in support of Neilson's claim against D'Angelis and not his claim against Bianculli
 
 
 [2]
 The parties' apparent agreement on the standard of "similarity" for "class of one" cases does not control our judgment, because this court is not bound by stipulations of lawKamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."). We are therefore called upon to apply the correct rule of law in disposing of the claim that Neilson did not, as a matter of law, satisfy the similarly situated requirement.
 
 
 [3]
 We believe that this test is simply an adaptation of the rational review standard applicable to equal protection "class of one" casesSee Weinstein v. Albright, 261 F.3d 127, 140 (2d Cir.2001) (rational basis review applies to equal protection claims not based on plaintiff's membership in a suspect class or on effects of the challenged action on fundamental rights).