In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 16-2009, -2077, & -2980

ILLINOIS TRANSPORTATION TRADE ASSOCIATION, *et al.*,

*Plaintiffs-Appellants,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellee,*

*and*

DAN BURGESS, *et al.*,

*Intervening Defendants-Appellees.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cv-00827 — **Sharon Johnson Coleman**, *Judge.*

_____

ARGUED SEPTEMBER 19, 2016 — DECIDED OCTOBER 7, 2016

_____

Before POSNER, WILLIAMS, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge.* This case, closely parallel to *Joe Sanfelippo Cabs, Inc. v. City of Milwaukee*, No. 16-1008, also decided today, involves constitutional challenges to the en-

deavor of a city (Chicago in this case, Milwaukee in the other) to stimulate greater competition in the "for-hire auto transportation market." That is the market composed of owners of taxicabs that one hails on the street, of livery services, which are usually summoned by phone (as for that matter taxis sometimes are), and of the newer auto-transport services for hire, of which the best known is Uber (the second best known is Lyft); generically these services are known either as Transportation Network Providers (TNPs) or as ridesharing services.

Because the acronym TNPs is not well known, nor the term ridesharing services, but Uber is very well known, we'll focus on Uber, which "at its core … is just an app that you download to your smartphone and use to get a nearby Uber driver to come pick you up. While some taxi services are getting on board with these newfangled apps most for-rent cars still wait at the taxi stand or require you to give the service dispatch center a call in advance. Uber doesn't do that. … You can only hitch an Uber ride via the service's app." Kristen Hall-Geisler, "5 Ways Uber Is Really Different from a Regular Taxi," http://auto.howstuffworks.com/tech-transport/5-ways-uber-really-different-from-regular-taxi1.htm (visited Oct. 6, 2016, as was the other website in this opinion). (However, Uber has now added a feature that allows customers to schedule an Uber pickup in advance. See Uber.com, "Scheduled Ride for Extra Peace of Mind," www.uber.com/info/scheduled-rides/.) There are other differences, which many consumers consider advantages of Uber over taxis: the storage of payment information, so that one does not need to be carrying cash or a credit card; the ability to see a time estimate of how long a pickup will take and also a driver's rating by past users; and the ability to re-

quest a ride from wherever one is (*e.g.*, from the comfort of home, inside during the rain) rather than by hailing on a street).

The plaintiffs are companies that own and operate either taxicabs or livery vehicles in Chicago or that provide services to such companies, such as loans and insurance. Taxi companies are tightly regulated by the City regarding driver and vehicle qualifications, licensing, fares, and insurance; livery companies are also tightly regulated, but we won't need to discuss them separately. Uber (which remember we're treating as representative of the TNPs) is less heavily regulated than the taxi and livery companies (until 2014 it wasn't regulated at all) and has a different business model. For example, you can't hail an Uber vehicle on the street; you must use a smartphone app to summon an Uber car. Since 2014 Uber and the other TNPs have been governed by an ordinance, but it is different from the ordinances governing taxi and livery services and more permissive; for example, it allows the companies to set their own fares, and in this and other ways allows them to do by contract some of the things that Chicago ordinances require taxi and livery companies to do.

The plaintiffs challenge the ordinance on seven grounds, of which four are based on the U.S. Constitution and the other three on Illinois law. The district judge dismissed all but the two claims that accuse the City of denying the equal protection of the laws by allowing the TNPs to compete with taxi and livery services without being subject to all the regulations governing those services. The plaintiffs appeal the district judge's dismissal of five of their claims and the City appeals the judge's refusal to dismiss the other two as well.

All seven of the plaintiffs' claims are weak. The first is that allowing the TNPs into the taxi and livery markets has taken away the plaintiffs' property for a public use without compensating them. A variant of such a claim would have merit had the City confiscated taxi medallions, which are the licenses that authorize the use of an automobile as a taxi. Confiscation of the medallions would amount to confiscation of the taxis: no medallion, no right to own a taxi, *Boonstra v. City of Chicago*, 574 N.E.2d 689, 694–95 (Ill. App. 1991), though the company might be able to convert the vehicle to another use. Anyway the City is not confiscating any taxi medallions; it is merely exposing the taxicab companies to new competition—competition from Uber and the other TNPs.

"Property" does not include a right to be free from competition. A license to operate a coffee shop doesn't authorize the licensee to enjoin a tea shop from opening. When property consists of a license to operate in a market in a particular way, it does not carry with it a right to be free from competition in that market. A patent confers an exclusive right to make and sell the patented product, but no right to prevent a competitor from inventing a noninfringing substitute product that erodes the patentee's profits. Indeed when new technologies, or new business methods, appear, a common result is the decline or even disappearance of the old. Were the old deemed to have a constitutional right to preclude the entry of the new into the markets of the old, economic progress might grind to a halt. Instead of taxis we might have horse and buggies; instead of the telephone, the telegraph; instead of computers, slide rules. Obsolescence would equal entitlement.

Taxi medallions authorize the owners to own and operate taxis, not to exclude competing transportation services. The plaintiffs in this case cannot exclude competition from buses or trains or bicycles or liveries or chartered sightseeing vehicles or jitney buses or walking; indeed they cannot exclude competition from taxicab newcomers, for the City has reserved the right (which the plaintiffs don't challenge) to issue additional tax medallions. Why then should the plaintiffs be allowed to exclude competition from Uber? To this question they offer no answer.

All that the City gives taxi-medallion owners is the right to operate taxicabs in Chicago, see Municipal Code of Chicago § 9-112-020(b) (a parallel provision, § 9-114-020(b), governs liveries). That isn't a right to exclude competitive providers of transportation. As pointed out in *Boston Taxi Owners Ass'n, Inc. v. City of Boston*, 2016 WL 1274531, at \*5 (D. Mass. March 31, 2016), "if a person who wishes to operate a taxicab without a medallion is prevented from doing so, it is because he or she would violate municipal regulations, not because he or she would violate medallion owners' property rights." Section 9-112-020(b) of the Municipal Code, cited above, which has been on the books since 1963, entitles the medallion owners to be the exclusive providers of taxi service, but not to exclude alternatives to the service they offer. The City has created a property right in taxi medallions; it has not created a property right in all commercial transportation of persons by automobile in Chicago.

The plaintiffs continue to receive some insulation from competition, because they alone are permitted to operate taxicabs in Chicago. Taxicabs are preferred to Uber and other TNPs by many riders, because you don't have to use an

app to summon them—you just wave at one that drives toward you on the street—and also because the fares are fixed by the City.

The plaintiffs argue that the City has discriminated against them by failing to subject Uber and the other TNPs to the same rules about licensing and fares (remember that taxi fares are set by the City) that the taxi ordinance subjects the plaintiffs to. That is an anticompetitive argument. Its premise is that every new entrant into a market should be forced to comply with every regulation applicable to incumbents in the market with whom the new entrant will be competing.

Here's an analogy: Most cities and towns require dogs but not cats to be licensed. There are differences between the animals. Dogs on average are bigger, stronger, and more aggressive than cats, are feared by more people, can give people serious bites, and make a lot of noise outdoors, barking and howling. Feral cats generally are innocuous, and many pet cats are confined indoors. Dog owners, other than those who own cats as well, would like cats to have to be licensed, but do not argue that the failure of government to require that the "competing" animal be licensed deprives the dog owners of a constitutionally protected property right, or alternatively that it subjects them to unconstitutional discrimination. The plaintiffs in the present case have no stronger argument for requiring that Uber and the other TNPs be subjected to the same licensure scheme as the taxi owners. Just as some people prefer cats to dogs, some people prefer Uber to Yellow Cab, Flash Cab, Checker Cab, *et al*. They prefer one business model to another. The City wants to en-

courage this competition, rather than stifle it as urged by the plaintiffs, who are taxi owners.

So there is no merit to the plaintiffs' claim that the City has taken property from them without compensation, and there is also no need to discuss four of their six other claims, which whether based on the Constitution or on Illinois common law add nothing to the takings claim. The two additional claims we do need to discuss are the equal protection claims, because those are the claims that the district judge thought had sufficient potential merit to survive a motion to dismiss. She ruled that the City, by failing to place as many regulatory burdens on the TNPs as on the taxicab companies, might have denied the latter the equal protection of the law. But this was taking equal protection literally, and it should not be taken so. Otherwise prospective entrants to a market who had lower costs than incumbent firms would not be allowed to enter the market unless some regulatory entity burdened the new entrants with regulations, whether or not necessary or even appropriate, that eliminated any cost advantage the new entrants would otherwise have in competing with the incumbent firms. The imposition of such an impediment to competition and disservice to consumers would be absurd.

The proper question to ask regarding equal protection is whether the regulatory differences between Chicago taxicabs and Chicago TNPs are arbitrary or defensible, and the City makes a compelling case that they're the latter. Taxis but not TNPs are permitted to take on as passengers persons who hail them on the street. Rarely will the passenger have a prior relationship with the driver, and often not with the taxicab company either; and it makes sense therefore for the

City to try to protect passengers by screening the taxi drivers to assure that they're competent and by imposing a uniform system of rates based on time or distance or both. So taxi service is regulated by the City of Chicago, but so is TNP service, though differently because the service is different from taxi service. A major difference is that customers, rather than being able to hail an Uber car, must sign up with Uber before being able to summon it, and the sign up creates a contractual relationship specifying such terms as fares, driver qualifications, insurance, and any special need of the potential customer owing to his or her having a disability. Unlike taxicab service Uber assumes primary responsibility for screening potential drivers and hiring only those found to be qualified, and the passengers receive more information in advance about their prospective rides—information that includes not only the driver's name but also pictures of him (or her) and of the car. Furthermore, the TNPs use part-time drivers extensively, and it is believed that these part-timers drive their cars fewer miles on average than taxicab drivers, who are constantly patrolling the streets in hope of being hailed; and the fewer miles driven the less likely a vehicle is to experience wear and tear that may impair the comfort of a ride in it and even increase the risk of an accident or a breakdown.

There are enough differences between taxi service and TNP service to justify different regulatory schemes, and the existence of such justification dissolves the plaintiffs' equal protection claim. Different products or services do not as a matter of constitutional law, and indeed of common sense, always require identical regulatory rules. The fallacy in the district judge's equal protection analysis is her equating her personal belief that there are no significant differences be-

tween taxi and TNP service with the perception of many consumers that there are such differences—a perception based on commonplace concerns with convenience, rather than on discriminatory or otherwise invidious hostility to taxicabs or their drivers. If all consumers thought the services were identical and that there was therefore no advantage to having a choice between them, TNPs could never have gotten established in Chicago.

Suppose the district judge happened to think dogs and cats interchangeable, and on that ground ruled that requiring dogs but not cats to be licensed (the law in Chicago) was a violation of equal protection. The proper response would be that she is entitled to her opinion but not entitled to impose it when the market perceives, and as we noted earlier has reasonable and nondiscriminatory grounds for perceiving, a rational difference between the competing animals that she does not perceive. Her belief that taxis and TNPs are interchangeable is similarly not shared by the entire relevant consumer market.

A "legislature, having created a statutory entitlement, is not precluded from altering or even eliminating the entitlement by later legislation. Were the rule otherwise, 'statutes would be ratchets, creating rights that could never be retracted or even modified without buying off the groups upon which the rights had been conferred.'" *Dibble v. Quinn*, 793 F.3d 803, 809 (7th Cir. 2015), quoting *Pittman v. Chicago Board of Education*, 64 F.3d 1098, 1104 (7th Cir. 1995); see also *Wisconsin & Michigan Ry. Co. v. Powers*, 191 U.S. 379, 387 (1903) ("the legislature is not making promises, but framing a scheme of public revenue and public improvement").

Beginning in the 1970s a deregulation movement swept the country, powered by the belief that competition is often a superior alternative to regulation. Entire agencies vanished, such as the Civil Aeronautics Board, which had greatly limited competition in the airline industry. Many cities loosened the regulatory limitations on taxi services—and this well before there were any TNPs. See Adrian T. Moore & Ted Balaker, "Do Economists Reach a Conclusion on Taxi Deregulation?" 3 *Econ Journal Watch* 109, 111 (2006). The deregulation movement has surged with the advent of the TNPs. Chicago, like Milwaukee in our companion *Sanfelippo* case, has chosen the side of deregulation, and thus of competition, over preserving the traditional taxicab monopolies. That is a legally permissible choice.

The judgment of the district court is affirmed in all but that court's ruling on the plaintiffs' equal protection claims; that ruling is reversed with instructions to dismiss those claims with prejudice.