## In the
# United States Court of Appeals
## For the Second Circuit

---

August Term 2017

No. 17-1251-cv

PROGRESSIVE CREDIT UNION, TAXI MEDALLION OWNER DRIVER
ASSOCIATION, INC., LEAGUE OF MUTUAL TAXI OWNERS, INC., KL
MOTORS, INC., SAFINI TRANSPORT, INC., WHITE & BLUE GROUP CORP.,
FIMA SERVICE CO., INC., CARL GINSBERG, and JOSEPH ITZCHAKY,

*Plaintiffs-Appellants,*

MELROSE CREDIT UNION, LOMTO FEDERAL CREDIT UNION,

*Plaintiffs,*

v.

CITY OF NEW YORK, NEW YORK CITY TAXI & LIMOUSINE COMMISSION,
and CHAIR MEERA JOSHI, in her official capacity as Chair of the New York City
Taxi & Limousine Commission,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Southern District of New York
No. 15 Civ. 9042 (AJN), Alison J. Nathan, District Judge, Presiding.
(Argued October 24, 2017; Decided May 1, 2018)

Before:        JACOBS, SACK, and PARKER, *Circuit Judges.*

Plaintiffs, various entities and individuals associated with the New York City medallion taxicab industry, brought this action under 42 U.S.C. § 1983 against the City of New York, the New York City Taxi & Limousine Commission, and the Commission's Chair, Meera Joshi, asserting violations of various federal constitutional rights. Plaintiffs alleged that defendants' regulatory scheme applicable to the ground transportation market in New York City violated their equal protection and due process rights and that they suffered a taking. The district court granted defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), on the ground that plaintiffs did not adequately allege that defendants' regulatory scheme failed rational basis review or that they suffered a deprivation of a constitutionally-cognizable property right without adequate procedural protections. The district court also dismissed plaintiffs' takings claim without prejudice, concluding it was unripe for review in federal court because plaintiffs failed to avail themselves of state procedures for seeking compensation. We affirm.

Todd A. Higgins, Crosby & Higgins LLP, New York, N.Y., *for appellants Progressive Credit Union, Taxi Medallion Owner Driver Association, Inc., League of Mutual Taxi Owners, Inc., KL Motors, Inc., Safini Transport Inc., White & Blue Group Corp., FIMA Service Co., Inc., Carl Ginsberg, and Joseph Itzchaky.*

MacKenzie Fillow (Scott Shorr, Richard Dearing, on the brief), for Zachary W. Carter, Corporation Counsel of the City of New York, New York, N.Y., *for appellees City of New York, New York City Taxi & Limousine Commission, and Chair*

*Meera Joshi, in her official capacity as the Chair of the New York City Taxi & Limousine Commission.*

BARRINGTON D. PARKER, Circuit Judge:

This appeal requires us to decide whether New York City's regulatory regime for the for-hire ground transportation industry violates the United States Constitution by subjecting yellow medallion taxicabs to different regulatory requirements than those imposed upon "for-hire vehicles,"such as services like Uber and Lyft.

Plaintiffs, credit unions, trade associations, and individuals affiliated with the medallion taxi industry in New York City, brought this lawsuit against defendants the City of New York, the New York City Taxi & Limousine Commission (the "TLC"), and the Chair of the TLC, Meera Joshi. As relevant to this appeal, plaintiffs brought, under 42 U.S.C. § 1983, three constitutional claims. They alleged: (1) that the City violates the Equal Protection Clause by imposing disparate regulatory requirements on medallion taxicabs and for-hire vehicles because the two categories of transportation are similarly situated; (2) that the City's manner of formulating and imposing regulations regarding taxicab and for-hire vehicle accessibility for persons with disabilities violated procedural due

process by severely diminishing the value of plaintiffs' medallions without affording them notice and an opportunity to be heard; and (3) that the City's regulatory framework resulted in a taking of their property interests in their medallions without just compensation.

The United States District Court for the Southern District of New York (Alison J. Nathan, *District Judge*) granted defendants' motion under Federal Rule of Civil Procedure 12(b)(6), dismissing plaintiffs' federal claims on various grounds and declined to exercise supplemental jurisdiction over their state-law claims. *See Melrose Credit Union v. City of New York*, 247 F. Supp. 3d 356 (S.D.N.Y. 2017). Plaintiffs appeal and we affirm.

## BACKGROUND

This lawsuit arises out of the technology-driven changes to the for-hire ground transportation market brought about by the entry into that market of companies such as Uber and Lyft, and the regulatory regime that the City has put in place in response to these changes. This regulatory framework generally divides the City's for-hire ground transportation industry into two groups. One group consists of the holders of traditional New York City taxicab medallions for yellow taxicabs. A medallion is a license issued by the TLC that permits the

holder to operate a yellow taxicab in New York City, use the medallion as security for loans, and lease the medallion to other taxicab operators. Medallion taxicabs are the only vehicles that may pick up passengers who hail a vehicle, and may do so anywhere on the streets of the City.[1]

The other group of industry participants is for-hire vehicles ("FHVs"), which the N.Y.C. Administrative Code defines in § 19-502(g) as vehicles "other than a taxicab." This group includes car services and carriers such as Uber and Lyft that do not possess TLC medallions but are permitted to transport passengers so long as they do so "only on the basis of telephone contract or prearrangement." N.Y.C. Admin. Code § 19-516(a); *see also* 35 R.C.N.Y. § 51-03 (Definitions) (defining "For-Hire Vehicle" as "a motor Vehicle licensed by the [TLC] to carry Passengers for-hire in the City, which: . . . (3) is not a Taxicab").

The TLC imposes different regulatory requirements on the two groups. Medallion taxicab operators must comply with regulations regarding fare rates

---

[1] The City's regulations provide as follows: "Taxicab means a motor vehicle, yellow in color, bearing a Medallion . . . and authorized to accept hails."). *See* 35 Rules of the City of New York ("R.C.N.Y.") § 51-03 (Definitions). Further, the TLC's regulations define a "hail" as "a request, either through a verbal (audio) action such as calling out, yelling, or whistling, and/or a visible physical action such as raising one's hand or arm, or through an electronic method such as an E-Hail App, for on demand Taxicab or Street Hail Livery Service at the metered rate of fare . . . by a person who is currently ready to travel." *Id.*

and surcharges, *see, e.g.*, 35 R.C.N.Y. §§ 58-26 (Operations–Rates and Tolls), 58-16(g) (Taxicab Improvement Fund), and must follow numerous rules covering such matters as car model, color, roof lights, distress signal lights, and rooftop advertising, *id.* at §§ 67-04 to 67-19.[2] The regulations also control other matters such as the amount of time and money for which a medallion can be leased. *Id.* at § 58-21 (Leasing a Taxicab or Medallion).

While the City imposes these and certain other regulatory burdens only on medallion taxicabs, the City also provides them significant benefits, most importantly the exclusive right to pick up passengers by street hail anywhere in the City. The New York City Administrative Code provides that "[n]o motor vehicle other than a duly licensed taxicab shall be permitted to accept hails from passengers in the street." N.Y.C. Admin. Code § 19-504(a)(1).

Notwithstanding these benefits, plaintiffs alleged in their amended complaint that FHVs are subjected to far fewer regulatory burdens than those imposed on medallion taxicabs. For example, while medallion taxicabs must charge fare rates set by the TLC, FHVs must instead only file a rate schedule with the TLC. Joint Appendix ("App'x") at A-620. And, plaintiffs alleged, while

---

[2]Other regulated subjects include upholstery, seats, windows, air conditioning, partitions, camera systems, placement of credentials, and payment systems. *Id.*

medallion taxis must use a vehicle approved by the TLC, FHVs "are not limited to any particular vehicle model set by the TLC, thereby unfairly allowing companies such as Uber to permit drivers to use newer and higher quality vehicles, giving riders a better overall experience." *Id.* at A-621. FHVs are also not required to comply with numerous other regulations applicable to medallion taxicabs, such as those requiring partitions or that the vehicle be painted a particular shade of yellow.

Although the City's regulations permit only medallion taxicabs to pick up passengers who hail a taxi from the street, plaintiffs alleged that recent regulations promulgated by the TLC have had the effect of rendering medallion holders' right to "hail exclusivity" meaningless because they permit the use of "e-hail" technology. An "e-hail" is when a passenger uses a smartphone app, such as Uber or Lyft, to arrange transportation. Through this technology, plaintiffs alleged, rides in FHVs can be obtained by a passenger in functionally the same way as a traditional hail.

Around 2011, the City determined that the use of a smartphone app to arrange transportation fits within the TLC's regulations' existing definition of a "prearrangement" and that FHVs could use smartphone apps to arrange rides for

passengers so long as they complied with TLC regulations. In January 2015, the TLC promulgated the "E-Hail Rules," which, according to plaintiffs, enable companies to furnish passengers with electronic, smartphone-based applications that enable them to arrange ground transportation through companies such as Uber and Lyft. *See, e.g.*, App'x at A-629–30.

Because the City permits FHVs to use e-hail smartphone applications, plaintiffs alleged that no material differences now exist between a traditional street hail and an e-hail. Consequently, plaintiffs alleged, a significant benefit medallion holders once enjoyed—the exclusive ability to pick up customers who hail a taxi on the street—has effectively disappeared. The result is that medallion taxicabs and companies like Uber or Lyft operate on the same business models, and serve the same "on demand transportation" passengers, and compete for the same drivers. *Id.* at A-635, 648. These developments mean that "passenger wait times for Uber E-Hails have all but disappeared" and that soon "response times to Uber's E-Hails" will be "virtually instantaneous." *Id.* at A-643. In the end, plaintiffs alleged, the effect of these market changes has been to dramatically decrease medallions' market value, leasing value, and the number of trips taken by passengers in medallion taxicabs and the corresponding meter revenue. *Id.* at

A-644–45, A-649. Plaintiffs plausibly alleged that these developments have resulted in "catastrophic harm" to the New York City taxicab industry. *Id.* at A-589.

Another important regulatory difference that plaintiffs emphasize arises from recently promulgated regulations, known as the "Accessible Conversion Rules," 35 R.C.N.Y. § 58-50 (Accessible Vehicle Conversion). These Rules, which are the focus of plaintiffs' due process claim, were intended to increase significantly the availability of vehicles accessible to persons with disabilities, especially those who use wheelchairs. In 2015, the TLC adopted the Accessible Conversion Rules, which apply exclusively to medallion taxicabs and not to FHVs. The City's goal in formulating the Rules is to make at least 50% of medallion taxicabs accessible to persons with disabilities by the year 2020. This goal is to be achieved through a multi-tiered lottery process administered by the TLC, under which randomly selected medallions are to be required to convert, according to particular timetables, the vehicle associated with the medallion to a vehicle that is accessible. App'x at A-623.[3]

---

[3] A medallion selected in the lottery is, however, only presumptively required to convert the associated vehicle to an accessible vehicle, as the owner of a selected medallion may transfer the conversion obligation to another medallion holder, such as for consideration, and thereby delay the conversion requirement, potentially permanently. *See* 35 R.C.N.Y. § 58-50(e).

Plaintiffs alleged that the Accessible Conversion Rules, insofar as they require the gradual replacement of inaccessible taxi vehicles with accessible vehicles, effectively converted their "unrestricted" medallions into "restricted" medallions, which is a form of medallion the TLC issues that may be used only with an accessible vehicle. Plaintiffs alleged that these "accessible medallions" are "far less valuable than unrestricted medallions" because disability-accessible vehicles are more expensive to operate than inaccessible ones. App'x at A-624.

Plaintiffs also challenge the manner in which the Rules were promulgated by the TLC. Plaintiffs alleged that they were adopted as the result of a rulemaking the TLC undertook as part of a settlement of a class action lawsuit filed against the TLC by disability-rights organizations and persons with disabilities who contended that the TLC violated the Americans with Disabilities Act and the New York City Human Rights Law because the TLC failed to provide for appropriate access to taxi service by persons with disabilities. *See Noel v. N.Y.C. Taxi & Limousine Comm'n*, 837 F. Supp. 2d 268 (S.D.N.Y. 2011), *vacated*, 687 F.3d 63 (2d Cir. 2012).

During the pendency of that lawsuit, the parties entered into a memorandum of understanding that provided, among other things, that the TLC

would propose rules leading to an increase in the number of accessible vehicles.

The TLC later proposed such rules, and, following public hearings and the solicitation of public comments, the proposed rules were revised and eventually adopted as the Accessible Conversion Rules.

In November 2015, plaintiffs brought this lawsuit, and, in March 2016, after the district court denied a motion for a preliminary injunction, the plaintiffs filed an amended complaint bringing federal and state-law claims. Defendants then moved under Rule 12(b)(6) to dismiss the amended complaint. The district court granted the motion, concluding that plaintiffs failed to adequately allege violations of the Equal Protection Clause or the Due Process Clause and that their takings claim was unripe because the plaintiffs had not availed themselves of available state remedies to attempt to obtain compensation. This appeal followed.

## STANDARD OF REVIEW

We review *de novo* a district court's dismissal of a complaint under Rule 12(b)(6) and accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *E.g.*, *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016). To survive a motion to dismiss, a complaint must plead

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Because ripeness is typically a jurisdictional inquiry, *Vandor, Inc. v. Militello*, 301 F.3d 37, 38 (2d Cir. 2002) (per curiam), and a legal determination, we also review *de novo* a district court's determination that a claim is unripe, *Connecticut v. Duncan*, 612 F.3d 107, 112 (2d Cir. 2010).

## DISCUSSION

Plaintiffs alleged in their amended complaint that, (1) defendants violated the Equal Protection Clause by imposing different regulatory burdens on medallion taxicabs and FHVs, because those industry participants are similarly situated and the regulatory differences are not supported by a rational basis; (2) defendants' promulgation of the Accessible Conversion Rules violated the procedural requirements of the Due Process Clause because it deprived them of a property right in their unrestricted medallions without adequate notice or an opportunity to be heard; and (3) the TLC's regulatory regime, by permitting FHVs to pick up passengers through smartphone applications, constitutes a

taking without just compensation of medallion holders' exclusive right to pick up passengers who hail a taxicab on the streets.

The district court dismissed these claims, concluding that plaintiffs failed to state an equal protection violation because medallion taxicabs and FHVs were not similarly situated and the different regulations were supported by rational bases. It further concluded that plaintiffs failed to state a violation of procedural due process because the only effect on plaintiffs of defendants' permitting FHVs to operate in New York City and their promulgation of the Accessible Conversion Rules was some diminution in the value of a medallion, which is not a protected property interest. And, further, even assuming the plaintiffs had suffered a deprivation of a cognizable property interest, they failed to plead facts to support their claim that they were denied a meaningful opportunity to be heard prior to the promulgation of the Rules. Finally, the district court concluded that plaintiffs' takings claim was unripe because plaintiffs failed to seek compensation through the adequate state procedures that were available. Because the district court's conclusions were correct, we affirm the judgment.

## I.    Equal Protection Claim

Plaintiffs' equal protection claim is that medallion taxicabs are similarly situated to FHVs and that the regulatory regime's different treatment of the two groups is not supported by a rational basis.  But, as the district court properly concluded, because the two groups are not similarly situated a rational basis exists for treating them differently.

When a plaintiff alleges an equal protection violation (without also alleging discrimination based upon membership in a protected class), the plaintiff must plausibly allege that he or she has been intentionally treated differently from others similarly situated and no rational basis exists for that different treatment.  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  Such a claim, often referred to as a "class of one" equal protection claim, stems from the Equal Protection Clause's requirement that the government treat all similarly situated people alike.  *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *overruled on other grounds, Appel v. Spiridon*, 531 F.3d 138, 140 (2d Cir. 2008).

To succeed on such a claim, plaintiffs "must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves."  *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citing

*Neilson*, 409 F.3d at 104).  Specifically, such a plaintiff must be "*prima facie* identical" to the persons alleged to receive irrationally different treatment. *Neilson*, 409 F.3d at 105.  The existence of highly similar circumstances can then provide an inference that the difference in treatment "lack[s] any reasonable nexus with a legitimate governmental policy. . . ."  *Id.*  Overall, "to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake."  *Ruston v. Town Bd. for Skaneateles*, 610 F.3d 55, 59–60 (2d Cir. 2010) (quotation omitted).

When a statute or regulatory regime imposes different classifications or regulatory burdens on groups of regulated participants, rational basis review contemplates "a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it."  *F.C.C. v. Beach Commc'ns*, 508 U.S. 307, 314-15 (1993) (quotation omitted).  Indeed, "a statutory classification that

neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 313. Rational basis review is "indulgent and respectful" though it is "not meant to be 'toothless.'" *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012) (quoting *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981)). And, whether a conceivable reason for enacting a statute actually motivated or was considered by the legislature is "entirely irrelevant for constitutional purposes," because legislatures are not required to articulate their reasons for enacting statutes and a "legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315.

To withstand a motion to dismiss such a claim, a plaintiff must plead sufficient facts that, treated as true, overcome the presumption of rationality that applies to government classifications.[4] A court is not confined to the particular

---

[4]This approach follows other Circuits. *See, e.g.*, *Flying J. Inc. v. City of New Haven*, 549 F.3d 538, 546 (7th Cir. 2008) ("[T]o get past a Rule 12(b)(6) motion to dismiss on a class of one equal protection claim, 'a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications.'" (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992)); *Teigen v. Renfrow*, 511 F.3d 1072, 1083 (10th Cir. 2007); *Giarratano v. Johnson*, 521 F.3d 298, 303-04 (4th Cir. 2008); *Dixon v. District of Columbia*, 666 F.3d

16

rational or irrational purposes that may have been raised in the pleadings.

*Johnson v. Baker*, 108 F.3d 10, 11-12 (2d Cir. 1997) (noting that equal protection rational basis review is appropriate in a motion to dismiss at the pleadings stage and that the court may hypothesize a legitimate, rational governmental purpose); *see also Mahone v. Addicks Utility Dist.*, 836 F.2d 921, 936 (5th Cir. 1988) ("Going outside the complaint to hypothesize a purpose will not conflict with the requirement that, when reviewing a complaint dismissed under Rule 12(b)(6), we accept as true all well-pleaded facts."). The amended complaint does not meet these exacting standards.

The amended complaint itself reflects numerous differences between medallion taxicabs and FHVs. Medallion taxicabs are the only vehicles that are permitted to pick up a passenger who hails a taxicab on the street, by, for example, raising a hand to seek transportation. Medallion taxicabs have a legally-sanctioned monopoly on these passengers as well as those who might hail a taxi because they do not own a smartphone or have not downloaded a ground transportation app. By contrast, FHVs are, by law, not permitted to serve these street-hail customers or customers who might only be able to pay with cash, customers that medallion taxicabs are required to accept. *See* 35 R.C.N.Y. § 80-

1337, 1342 (D.C. Cir. 2011); *In re City of Detroit*, 841 F.3d 684, 701 (6th Cir. 2016).

17(c)-(d). While medallion taxicabs may serve anyone who hails a taxi, FHVs are limited to customers who have made a phone call, downloaded an app, or otherwise entered into a customer relationship with a FHV company. This relationship typically involves an exchange of information or the use of smartphone apps such as Uber or Lyft. These relationships often require users to share information, such as their names, payment methods, and pick up and drop off locations. In contrast, a person who hails a medallion taxi has no prior relationship with the taxi company or driver.

These different circumstances have led the TLC to impose various regulations on medallion taxicabs that are not imposed on FHVs. Notable among those regulations are vehicle attributes, such as a distinctive yellow color, overhead lights, air conditioning, and a uniform rate structure. These regulations conceivably promote safety, convenience, easy identification, comfort, and uniformity of service for customers who hail a taxicab on the street and have had no prior dealings with the driver or the taxicab company. Moreover, other regulations, such as the requirement of a partition between a driver and a passenger or an emergency warning light, may promote driver safety when picking up customers who have no prior relationship with the taxicab company.

As for the Accessible Conversion Rules, the TLC's decision to impose increased accessibility fleet requirements on medallion taxicabs and not also on FHVs rationally serves the City's legitimate object of making it easier for disabled persons to obtain transportation via street hail.[5]

We conclude these differences mean that medallion taxicabs and FHVs are not *prima facie* identical for "class of one" purposes and that they provide a rational basis for the different regulatory treatment applied to each group. As another court has observed, "[t]here are enough differences between taxi service and [FHV] service to justify different regulatory schemes, and the existence of such justification dissolves the plaintiffs' equal protection claim. Different

---

[5]Defendants note that passengers seeking accessible service through FHVs have options for accessible vehicles, that the TLC has an accessible dispatch program, and that there are FHV companies that specialize in serving persons with disabilities. In contrast, before the adoption of the Accessible Conversion Rules, persons with disabilities had few options when seeking a taxicab by street hail. Defendants also note that the TLC has considered and is considering how best to improve accessibility in the FHV market, and that, in 2017, the TLC proposed rules that would, in general, require FHV companies to dispatch 25% of all FHV trips in wheelchair-accessible vehicles by July 1, 2022. Following an administrative rulemaking, these rules were promulgated in December 2017, and are set to go into effect on July 1, 2018. *See* 35 R.C.N.Y. § 59B-17(c). In March 2018, various FHV industry participants filed a lawsuit to block these rules, and, on April 18, 2018, the Southern District of New York denied their bid for a preliminary injunction to enjoin the implementation of the rules. *See Livery Round Table, Inc. v. N.Y.C. Taxi & Limousine Comm'n*, No. 18 Civ. 2349 (JGK), 2018 WL 1890520 (S.D.N.Y. April 18, 2018). The plaintiffs then withdrew their lawsuit. *See* Dkt. 48, No. 18 Civ. 2349 (JGK) (S.D.N.Y. April 20, 2018).

products or services do not as a matter of constitutional law, and indeed of common sense, always require identical regulatory rules." *Ill. Trans. Trade Ass'n v. City of Chicago*, 839 F.3d 594, 598 (7th Cir. 2016). For these reasons, we affirm the district court's grant of defendants' motion to dismiss plaintiffs' equal protection claim.

## II.    Procedural Due Process Claim

Plaintiffs argue that the Accessible Conversion Rules deprived them of property and that the nature of the rulemaking process used to adopt the Rules deprived them of notice and of a meaningful opportunity to be heard prior to the promulgation of the Rules. The district court concluded that plaintiffs failed to adequately allege a constitutionally-cognizable property interest or that the Rules were promulgated through constitutionally deficient processes. We agree.

To succeed on a procedural due process claim, "a plaintiff must 'first identify a property right, second show that the state has deprived him [or her] of *that* right, and third show that the deprivation was effected without due process.'" *Local 342, Long Island Pub. Serv. Emps., UMD, ILA, AFL-CIO v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) (quoting *Mehta v. Surles*, 905 F.2d 595, 598 (2d Cir. 1990) (per curiam)). "In a § 1983 suit brought to enforce

procedural due process rights, a court must determine (1) whether a property interest is implicated, and, if it is, (2) what process is due before the plaintiff may be deprived of that interest." *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011).

To determine whether a constitutionally cognizable property right is implicated, we look to whether the interest involved would be protected under state law and then we weigh the importance to the holder of the right. *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 317 (2d Cir. 2002). Whether a particular property interest rises to the protection of the Fourteenth Amendment is a constitutional inquiry, because "[w]hile state law defines the underlying substantive interest, 'federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause.'" *Ezekwo v. N.Y.C. Health & Hosps. Corp.*, 940 F.2d 775, 782 (2d Cir. 1991) (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978)); *see also Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756-57 (2005) (noting that the determination of whether state law creates a property interest within the meaning of the Fourteenth Amendment, "despite its state-law underpinnings, is ultimately one of federal constitutional law," although "[r]esolution of the

federal issue begins . . . with a determination of what it is that state law provides").

As to the second inquiry, whether constitutionally adequate procedures were used to undertake the constitutionally-cognizable deprivation, it is settled that prior to such a deprivation, the state must use procedures that appropriately balance the interests involved in the deprivation.  The interests to be balanced are (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  In evaluating such a process, "substantial weight must be given to the good-faith judgments of the individuals charged with" administering government programs as to the process that should be due, *id.* at 349, but, overall, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

These principles foreclose plaintiffs' procedural due process claim. The district court properly concluded that plaintiffs failed to adequately allege that they possess a constitutionally cognizable property interest that was impaired by the imposition of the Accessible Conversion Rules. Further, the district court properly concluded that plaintiffs' amended complaint was devoid of plausible allegations that the rulemaking process was tainted by the absence of appropriate notice or a meaningful opportunity to be heard.

As to the alleged deprivation of property, plaintiffs alleged, at best, a decrease in the value of their medallions. They did not allege that their medallions were voided or confiscated or that they can no longer be used. Instead, they contend that the Accessible Conversion Rules effected a deprivation of their "full-fledged property interest in their unrestricted medallion" and that the Rules constitute an unconstitutional "conversion of their unrestricted medallions to accessible medallions." Appellants' Br. at 44. Plaintiffs' argument is in essence that the Rules forced a conversion of their "unrestricted medallions," which need not be associated with an accessible vehicle, to the less valuable "accessible medallions," that must be used with an accessible vehicle

23

and that, as a result, command a lower value.  Plaintiffs' claim is that this diminution constitutes a constitutionally-cognizable deprivation of property.

We disagree.  The Accessible Conversion Rules, by requiring the conversion to accessible vehicles, did not impair plaintiffs' property rights.  Medallions do not give plaintiffs vested, constitutionally protected property rights in any particular taxicab configuration.  Medallion taxicabs operate in New York in a regime that is  heavily regulated.  City and state law affords wide administrative discretion to the TLC to regulate taxicabs and to other City and state agencies to regulate transportation generally.  New York State law, through the New York City Charter, grants the TLC extremely broad authority to enact rules governing the taxicab industry, rules that have been upheld in the courts.  The TLC was created with the stated purposes of "continuance, further development and improvement of taxi and limousine service in the city of New York."  *Greater N.Y. Taxi Ass'n v. N.Y.C. Taxi & Limousine Comm'n*, 36 N.E.3d 632, 637 (N.Y. 2015) (quoting N.Y.C. Charter § 2300).  In *Greater New York*, the New York Court of Appeals upheld, against a separation of powers challenge and a challenge to the TLC's rulemaking authority, the TLC's power to enact the "Taxi of Tomorrow" rules.  *Id.* at 640.  Those rules established a particular vehicle make

24

and model as the City's "official taxicab" and, generally "require[d] each taxi owner to purchase [that specific vehicle] to replace an existing vehicle when it is retired." *Id.* at 635. Our court has recognized that "[b]ecause taxis are an important part of the public life of the City and have a City-granted monopoly on providing a crucial service, the taxi industry is pervasively regulated by the [TLC]. . . . [T]he [TLC] has been given broad authority to promulgate rules dealing with every aspect of the industry." *Statharos v. N.Y.C. Taxi & Limousine Comm'n*, 198 F.3d 317, 324 (2d Cir. 1999).

Any or a combination of the regulatory requirements imposed by defendants could theoretically decrease the value of a medallion by increasing operating costs. Other government-mandated changes such as increased subway or bus service could also decrease the value of a medallion by decreasing the size of the ground transportation market. With the Accessible Conversion Rules, the TLC has imposed a regime intended to increase the number of accessible vehicles, a legislative purpose that is indisputably legitimate. Because we see no constitutionally-cognizable difference between this regulatory requirement and the myriad others the TLC imposes, we see no unlawful deprivation of property.

We readily acknowledge that the plaintiffs may have suffered a decrease in the value of their medallions as a consequence of regulations imposed by the TLC. But this decrease is not something that violates the Due Process Clause. The Fifth Circuit recently noted that there is no cognizable property interest in the market value of taxi licenses because "whatever interest Plaintiffs hold in their [taxi licenses] is the product of a regulatory scheme that also vests the City with broad discretion to alter or extinguish that interest." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 274 (5th Cir. 2012); *see also Minneapolis Taxi Owners Coalition, Inc. v. City of Minneapolis*, 572 F.3d 502, 508–10 (8th Cir. 2009) ("[t]he taxicab licenses themselves do not carry an inherent property interest guaranteeing the economic benefits of using the taxicab license," leaving license holders without "protected property interests in the market value of their licenses" such that an ordinance that removed a city's cap on the number of licenses issued by the city and thereby damaging the market value of these licenses "does not implicate the holders' property interests or, it follows, their due process rights"); *cf. Ill. Trans. Trade Ass'n*, 839 F.3d at 596-97 ("'Property' does not include a right to be free from competition. . . . Taxi medallions authorize the

26

owners to own and operate taxis, not to exclude competing transportation services."). We agree with these conclusions.

Plaintiffs also did not adequately allege the other required element of a procedural due process claim: denial of an adequate opportunity to be heard. Plaintiffs do not contend that the Accessible Conversion Rules were adopted without affording them and other interested parties any opportunity to be heard. Indeed, the TLC's rulemaking process leading to the promulgation of the Accessible Conversion Rules involved the posting of notices, two public hearings, and the solicitation of public comments at those hearings, by mail, fax, email, and through the City's rulemaking website.

The sole specific opportunity-to-be-heard deficiency identified by plaintiffs in their amended complaint is that the rulemaking "arose out of the *Noel* settlement." App'x at A-623, ¶ 145 & n.8. Plaintiffs argue that they were deprived of their property because the "conclusion of the rulemaking process was pre-ordained as a result of the *Noel* settlement." Appellants' Br. at 44-45. We are not persuaded by this argument. The memorandum of understanding in the *Noel* litigation merely required the City to propose rules to increase the availability of accessible taxicabs. Those rules might not have been adopted.

And, regardless, plaintiffs did not allege that the TLC's rulemaking process was a sham process or failed in any way to comply with applicable administrative procedures. *See Liberty Cable Co. v. City of New York*, 60 F.3d 961, 964 (2d Cir. 1995) ("A party's due process rights are not violated when it may participate fully in an administrative agency proceeding and later seek state-court review.").

To the contrary, the plaintiffs received the process they were due: the legislative process, in the form of an administrative rulemaking. That the process was triggered by a settlement is of no constitutional significance. A rulemaking process is not constitutionally deficient because it was undertaken in response to civil rights litigation. Accordingly, we affirm the district court's dismissal of plaintiffs' procedural due process claim.

**III.    Federal Takings Claim**

Plaintiffs also brought a takings claim, alleging that the TLC's institution of the E-Hail Rules, which permit the operation of smartphone-based FHV service in New York City, deprived plaintiffs of property—"their statutory right to hail exclusivity"—without just compensation in violation of the Fifth Amendment. The district court dismissed this claim, without prejudice, concluding that because plaintiffs had failed to allege that they had sought compensation

through available state procedures, they had failed to exhaust their takings claim and it was unripe

These exhaustion requirements are grounded in the two-pronged framework for evaluating a takings claim announced in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985). *Williamson County* stands for the proposition that "[t]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." 473 U.S. at 194. Consequently, "a Fifth Amendment claim is premature until it is clear that the Government has both taken property *and* denied just compensation." *Horne v. Dep't of Agric.*, 569 U.S. 513, 525-26 (2013). Under this doctrine, for a takings claim to be ripe, "the plaintiff must show that (1) the state regulatory entity has rendered a 'final decision' on the matter, and (2) the plaintiff has sought just compensation by means of an available state procedure." *Sherman v. Town of Chester*, 752 F.3d 554, 561 (2d Cir. 2014) (quotation omitted). For these procedures to be "available," the state must have provided a "reasonable, certain and adequate provision for obtaining compensation" at the time of the taking. *Williamson Cty.*, 473 U.S. at 194 (quotation omitted). "Relief under a state compensation procedure must be

attempted even where it remains unsure and undeveloped." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 380 (2d Cir. 1995) (quotation omitted).

This Court has observed that "[i]t is well-settled that New York State has a reasonable, certain and adequate provision for obtaining compensation." *Kurtz v. Verizon N.Y., Inc.*, 758 F.3d 506, 514 (2d Cir. 2014). The New York State Constitution provides that "[p]rivate property shall not be taken for public use without just compensation." N.Y. Const. Art. I., § 7(a). The New York Court of Appeals has recognized that this "just compensation" provision applies to takings through agency regulation or through legislative action. *See Rochester Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 520 N.E.2d 528, 533 (N.Y. 1988) ("While it is clear that government regulation may permissibly effect economic interests or expectations, if the regulation goes too far the government's action will be treated as a public taking for which just compensation is required."); *520 East 81st Street Assocs. v. State of New York*, 780 N.E.2d 518, 518 (N.Y. 2002) (recognizing the applicability of the takings clause of the New York State Constitution to a "regulatory taking of property by the State"). It is also clear that takings claims may be asserted against local governments, such as New York City. *See, e.g.*, *Kim v. City of New York*, 681 N.E.2d 312, 313–14 (N.Y. 1997).

It is not disputed that plaintiffs have failed to avail themselves of these procedures. In their bid to satisfy the second *Williamson County* prong, plaintiffs point to a special proceeding that the credit union plaintiffs (a subset of the plaintiffs in this lawsuit) filed against the City, the TLC, and other respondents, under Article 78 of the New York State Civil Practice Law and Rules. But, in that Article 78 action, the plaintiffs sought only equitable and declaratory relief, such as a writ of mandamus to compel the City, the TLC, and the other respondents to promulgate rules and regulations "upholding and enforcing the taxicab medallion owners' exclusive right to hails, particularly in light of recent E-Hailing activities by certain FHVs, including Uber." App'x at A-209-10, ¶¶ 139-43. Critically, plaintiffs did not seek monetary compensation. Indeed, they specifically alleged that they were not seeking compensation because they intended to file a takings claim in another lawsuit at some future point. *Id.* at A-185 n.4. The Supreme Court of the State of New York, Queens County, dismissed that action, on the ground that the City and the TLC were within their rule- (and policy-) making authority in enacting the E-Hail rules and in permitting FHVs to operate with smartphone applications. *See id.* at A-225-27.

Thus, because plaintiffs have not yet asked the state for compensation, the state has not had the occasion to determine whether to award or deny compensation, making plaintiffs' takings claim not ripe for review in federal court.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court is

**AFFIRMED.**