18-737-cv
Hu v. City of New York

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term 2018

(Argued: March 6, 2019          Decided:  June 13, 2019)

Docket No. 18-737-cv

_____

ERIC HU, NY DRILLING, INC., AND 888 CONSULTING CORP.,
*Plaintiffs-Appellants*,

v.

THE CITY OF NEW YORK, DENNIS BURKART, JOSE L. ESPAILLAT, MICHAEL CAMERA, RAFAEL COLLIS, SALVATORE CONCIALDI, ROBERT TURNER, CESAR ROMERO, RICK D. CHANDLER, MUHAMMAD IMRAN, D. ERIC HOYT,
*Defendants-Appellees*,

JOHN/JANE DOES, NOS. 1-10,
*Defendants*.*

_____

Before:

JACOBS and LYNCH, *Circuit Judges*, and J. HALL, *District Judge*.**

The Plaintiffs-Appellants, an Asian construction worker and Asian-owned companies, brought suit against the City of New York and several of its

---

* The Clerk of Court is directed to amend the caption as shown above.

** Judge Janet C. Hall, United States District Court for the District of Connecticut, sitting by designation.

employees, alleging that the defendants discriminatorily enforced municipal building codes against the plaintiffs on the basis of race and personal animus. The plaintiffs asserted Equal Protection claims under the theories articulated in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) and *LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980). They also raised claims under the Due Process Clause, section 1981 of title 42 of the United States Code, the *Monell* doctrine, and New York tax law. The United States District Court for the Eastern District of New York (Allyne Ross, *Judge*) dismissed the suit under Federal Rule of Civil Procedure 12(b)(6). We AFFIRM the District Court's dismissal of the plaintiffs' *Olech* claim, Due Process claim, and *Monell* claim. However, we VACATE the judgment as to the plaintiffs' section 1981 claim and *LeClair* claims, as well as their state law claim.

_____

DANIEL J. SCHNEIDER, Farber Schneider Ferrari LLP, New York, NY, *for Plaintiffs-Appellants*.

ANTONELLA KARLIN, Assistant Corporation Counsel (Richard Dearing and Kathy Chang Park, *on the brief*), *for* Zachary W. Carter, Corporation Counsel of the City of New York, New York, NY, *for Defendants-Appellees*.

_____

J. HALL, *District Judge*:

Plaintiffs Eric Hu ("Hu"), 888 Consulting Corporation ("888 Consulting"), and NY Drilling ("NY Drilling") are an Asian construction worker and Asian-owned companies.[1] They brought this lawsuit against the City of New York

---

[1] This appeal was heard in tandem with *Hsin v. City of New York*, Case No. 18-751-cv, a related but not consolidated action. We resolve *Hsin* in a separate Summary Order.

("the City"), Assistant Chief Inspector Dennis Burkart ("Burkart"), and several of Burkart's colleagues at the Department of Buildings ("DOB"), alleging that the defendants selectively enforced the City's building codes on the basis of racial animus against Asians and personal animus against Hu. The plaintiffs raised claims under the Equal Protection Clause, the Due Process Clause, section 1981 of title 42 of the United States Code, the *Monell* doctrine, and New York tax law.

The United States District Court for the Eastern District of New York (Ross, *J.*) dismissed the plaintiffs' federal causes of action under Federal Rule of Civil Procedure 12(b)(6) and declined to exercise supplemental jurisdiction over the remaining state claim. The plaintiffs now appeal, arguing that the District Court improperly applied a heightened pleading standard to their Amended Complaint. For the reasons that follow, we AFFIRM in part and VACATE in part the judgment below.

**I.     BACKGROUND**

The Amended Complaint alleges the following facts, which we take as true for the purposes of evaluating a motion to dismiss.

This action centers primarily on Burkart's "personal vendetta" against Asians in general and Hu in particular. Burkart's racial animus stems from his belief that Asians were responsible for the downfall of a construction company

3

that he owned prior to his employment at DOB. In particular, Burkart blames Asians for undercutting his rates to the point where he could no longer compete.

Burkart's alleged animus against Hu, a Taiwanese-American construction worker, has several sources. In 2011, Hu filed a complaint with DOB alleging that Burkart's enforcement of the building code was racially discriminatory. Later that year, Hu sued one of Burkart's colleagues at DOB for hitting Hu with a car. Although Burkart was only a passenger in the vehicle and was not named as a defendant in the lawsuit, the plaintiffs believe that DOB may have disciplined Burkart for his involvement in the car accident. In 2014, Hu filed an FBI report alleging extortion by another of Burkart's colleagues, Massimo Dabusco ("Dabusco"). As a result of the ensuing FBI investigation, Dabusco left DOB, pled guilty to criminal charges, and was sentenced to 18 months' imprisonment. *See* Judgment (Doc. No. 47), *United States v. Massimo Dabusco*, EDNY Docket No. 16-CR-559-DLI.

Burkart has not been shy in voicing his feelings about Asians and Hu. While inspecting construction worksites, Burkhart has been observed harassing, belittling, and threatening Asian workers. He has been overheard calling Hu "a rat" for reporting Dabusco to the FBI, as well as bragging about his plans to

4

"shut down every one of Hu's jobsites around the city." Hu Appellants'
Appendix ("Hu Appx.") (Doc. No. 40), Case No. 18-737-cv, at A24 ¶ 75, A27 ¶ 96.
According to other DOB inspectors, Burkart even has a picture of Hu on his wall.
It is an open secret within the City's construction community that a jobsite that
involves Hu will be shut down by DOB inspectors.

NY Drilling and 888 Consulting have also become targets of Burkart's
animosity, due both to their racial composition and to their close ties to Hu. NY
Drilling is a construction company that employed Hu until 2015, when Hu
formed his own construction company, 888 Consulting. Both NY Drilling and
888 Consulting are owned and controlled by Asians, and they frequently work
with each other on construction jobs.

Burkart has acted on his prejudices by targeting the plaintiffs' worksites
for inspections and unwarranted building code violations. Although DOB
inspectors are assigned predetermined routes, Burkart regularly deviates from
his routes to visit, inspect, and issue violations to construction sites that are
managed and operated by Asian workers and Asian-owned companies. He
often does so on his own time and while off duty. Further, he conducts these site
visits on his own initiative and not in response to public complaints, even though

5

DOB is a complaint-driven agency that takes enforcement actions primarily in response to grievances received from the general public. During these visits, Burkart issues violations and stop work orders, often for aspects of construction that fall outside the purview of his division within DOB, the Concrete Enforcement Unit. Burkart also appears to issue violations to Asian-run construction sites at a higher rate than his colleagues. According to the plaintiffs' review of building code violations, Burkart issues 63 percent of his violations to Asian-run construction companies, workers, or sites, as compared to between 8 and 28 percent for other DOB inspectors.

While Burkart is the only defendant alleged to harbor animus against Hu or Asians, Burkart has enlisted the help of other DOB officers in harassing the plaintiffs. Burkart or members of his team actively search DOB databases to identify construction worksites that employ Hu. When Burkart becomes aware of a job involving Hu, 888 Consulting, or NY Drilling, Burkart makes sure that he or a member of his team visits that jobsite. Burkart also sends other DOB inspectors outside of their assigned routes to issue violations to Asian developers and contractors. Sometimes, Burkart visits a construction site, takes pictures, and then leaves without taking any enforcement action. Shortly thereafter, however,

another DOB inspector will return to that site and issue a violation for the conditions observed by Burkart. The plaintiffs believe that Burkart directs other DOB inspectors to issue violations in order to "avoid the optic of having an enormous number of violations and SWO[s] [stop work orders] signed in Burkart's name which are for alleged violations beyond the scope of his own duties [and] outside his route and region[.]" Hu Appx. at A34 ¶ 166.

The Amended Complaint details four enforcement actions. Although the specifics vary, they generally involve Burkart, by himself or in coordination with other DOB officers, sanctioning the plaintiffs based on fabricated or frivolous building code violations; orchestrating time-consuming audits of the plaintiffs' jobsites; forcing the plaintiffs to install unnecessary onsite protections, such as additional fencing; or halting the plaintiffs' projects with stop work orders.

These and other enforcement actions are taking a financial toll on the plaintiffs. Burkart's violations have burdened the plaintiffs with fines, compliance costs, and legal fees. Clients are firing the plaintiffs due to jobsite delays resulting from DOB audits and stop work orders, and some are suing the plaintiffs for breaches of contract. The plaintiffs are also losing prospective

business, because of Hu's reputation as a lightning rod for DOB inspections and sanctions.

**II.    PROCEDURAL HISTORY**

The plaintiffs brought this lawsuit in April 2017. *See generally* Complaint (Doc. No. 1), EDNY Docket No. 17-cv-2348. At a pre-motion conference, the District Court permitted the plaintiffs to amend their pleadings to address deficiencies the Court had identified. *See generally* Transcript for Telephonic Conference ("Pre-Motion Conf. Tr.") (Doc. No. 43-8), EDNY Docket No. 17-cv-2348. The plaintiffs filed an Amended Complaint, and the defendants moved to dismiss shortly thereafter. In March 2018, the District Court granted the Motion to Dismiss with prejudice, and this appeal followed.

**III.   STANDARD OF REVIEW**

We review *de novo* a district court's dismissal of a complaint under Rule 12(b)(6). *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). For the purposes of such a review, "this Court must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." *Matson v. Bd. of Educ. of City Sch. Dist. of New York*, 631 F.3d 57, 63 (2d Cir. 2011) (internal quotation marks omitted). Nevertheless, the plaintiff's complaint must "contain sufficient factual matter, accepted as true, to

state a claim to relief that is plausible on its face." *Id.* "A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 48 (2d Cir. 2018) (internal quotation marks omitted). In deciding a Rule 12(b)(6) motion, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings[,] and matters of which judicial notice may be taken." *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).

**IV. DISCUSSION**

In the Amended Complaint, the plaintiffs assert (1) Equal Protection claims for discriminatory enforcement of the building code; (2) a section 1981 claim for interfering on the basis of race with the right to make and enforce contracts; (3) Due Process claims for depriving them of their chosen occupation and for engaging in a systematic campaign of government harassment; (4) a *Monell* claim against the City; and (5) a state law taxpayer claim for violation of section 51 of the New York General Municipal Law.

The District Court dismissed the federal claims with prejudice and declined to exercise supplemental jurisdiction over the remaining state claim. As

9

to the Equal Protection and section 1981 claims, the District Court concluded that the plaintiffs had not plausibly alleged that they had been treated differently from another similarly situated comparator. It dismissed the plaintiffs' Due Process claims on the grounds that the Amended Complaint did not plausibly allege either (1) that the defendants' actions had entirely precluded the plaintiffs from working in the construction industry, or (2) that the defendants' actions rose to the level of intentional and systematic government harassment. Finally, the District Court dismissed the plaintiffs' *Monell* claim for, *inter alia*, failure to plausibly allege that the plaintiffs' constitutional injuries were caused by an official municipal policy.

On appeal, the plaintiffs argue that District Court improperly applied a heightened pleading standard to their federal claims. They further argue that, even if dismissal of these claims was warranted, the District Court erred by dismissing the Amended Complaint with prejudice. We address these arguments below. Before doing so, however, we first respond to the defendants' contention that two of the plaintiffs – Hu and 888 Consulting – lack standing because they have not plausibly pled an injury-in-fact, an issue that was not addressed by the court below.

## A.   Standing

Because "[a]ppellate courts have an independent obligation to examine their own jurisdiction," *In re TPG Troy, LLC*, 793 F.3d 228, 232 (2d Cir. 2015) (internal quotation marks omitted), we must always address questions of standing, even when neither the parties nor the court below have considered the issue, *see FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230–31 (1990).  To satisfy the requirements of Article III standing, plaintiffs must demonstrate "(1) [an] injury-in-fact, which is a concrete and particularized harm to a legally protected interest; (2) causation in the form of a fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief." *Selevan v. New York Thruway Auth.*, 711 F.3d 253, 257 (2d Cir. 2013) (internal quotation marks omitted).  These elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case[.]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  As a result, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.*  Thus, "general factual allegations of injury resulting from the defendant's conduct may suffice" at the pleading stage,

11

because it is presumed on a motion to dismiss that "general allegations embrace those specific facts that are necessary to support the claim." *Id.* (internal quotation marks and alterations omitted); *see also John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736–37 (2d Cir. 2017) (applying *Lujan*'s standard).

Notwithstanding the defendants' claims to the contrary, the Amended Complaint plausibly alleges injuries to Hu and 888 Consulting that are fairly traceable to the defendants' alleged actions. The plaintiffs' allegations detail how Burkart and his colleagues have increased the plaintiffs' costs of doing business by conducting audits, forcing the plaintiffs to pay fines for unwarranted violations, and halting work on the plaintiffs' jobsites with stop work orders. As a result of this targeting, the plaintiffs have not only lost current clients and future business, but they have also incurred legal fees challenging notices of violation and defending against breach-of-contract suits from dissatisfied clients. The Amended Complaint supplements these general allegations of harm with specific instances where the defendants' enforcement activities financially burdened the plaintiffs. To take one example, Burkart allegedly "forced Plaintiffs, at significant cost, to install protection on neighbors' walls" at one of their construction sites, which enforcement actions ultimately resulted in the

12

plaintiffs being fired from the job. Hu Appx. at A38 ¶¶ 193–196.[2] Taken together, these allegations are more than sufficient to establish Hu and 888 Consulting's standing at the pleading stage. We therefore turn to the merits of the plaintiffs' claims.

B.     Equal Protection Claims

The Amended Complaint can be reasonably construed as alleging three types of Equal Protection claims for discrimination based on the selective enforcement of the City's building codes. The first two – which proceed under the theory of *LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980) – allege that the defendants treated the plaintiffs differently from others similarly situated on the basis of racial animus against Asians and personal animus against Hu. The third claim adopts the theory of *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), alleging that the defendants' differential treatment of the plaintiffs violated the Equal Protection Clause because it was irrational and wholly arbitrary.

---

[2] The Amended Complaint does not expressly allocate harms between the three plaintiffs, alleging instead that the various injuries accrued to the "plaintiffs." *See, e.g.*, Hu Appx. at A44. It does, however, explicitly define the "plaintiffs" to include Hu, 888 Consulting, and NY Drilling. *Id.* at A12. Thus, a natural reading of the Amended Complaint is that the alleged injuries are shared by all three plaintiffs, an inference that is buttressed by the fact that the plaintiffs have a close working relationship with one another.

The District Court dismissed these claims on the grounds that the Amended Complaint failed to plausibly allege a comparator that was similarly situated to the plaintiffs. In reaching this outcome, it correctly noted that there is disagreement among district courts in this Circuit as to the degree of similarity required in a *LeClair* claim. *See Leon v. Rockland Psychiatric Ctr.*, 232 F. Supp. 3d 420, 432 (S.D.N.Y. 2017) (documenting this split). Some district courts have applied the similarity standard for an *Olech* cause of action to *LeClair* claims, requiring that plaintiffs show an "extremely high" level of similarity between themselves and the persons to whom they compare themselves. *See, e.g.*, *Kamholtz v. Yates Cty.*, No. 08-CV-6210, 2008 WL 5114964, at *5 (W.D.N.Y. Dec. 3, 2008), *aff'd*, 350 F. App'x 589 (2d Cir. 2009); *Spanierman v. Hughes*, 576 F. Supp. 2d 292, 307 (D. Conn. 2008); *Dones v. City of New York*, No. 07 CIV. 3085 (SAS), 2008 WL 2742108, at *9 (S.D.N.Y. July 9, 2008). Others have applied a less stringent standard to *LeClair* claims, requiring only that plaintiffs show that they are "roughly equivalent" to the proffered comparators. *See, e.g.*, *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 696–97 (S.D.N.Y. 2011); *T.S. Haulers, Inc. v. Town of Riverhead*, 190 F. Supp. 2d 455, 462–63 (E.D.N.Y. 2002). In this case, the District Court adopted the latter approach. It concluded, however,

14

that the Amended Complaint failed to allege a comparator that was even roughly equivalent to the plaintiffs.

On appeal, neither party disputes that the plaintiffs' *LeClair* claims should be subjected to a less stringent similarity standard than their *Olech* claim. This apparent agreement, however, does not control our judgment, as we are not bound by stipulations of law. *See Neilson v. D'Angelis*, 409 F.3d 100, 104 n.2 (2d Cir. 2005), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008). Because we conclude that the viability of the plaintiffs' Equal Protection claims turns on the precise degree of similarity required by *LeClair*, we write to resolve this open question and, more generally, to clarify the relationship between *LeClair* and *Olech*. For the reasons that follow, we agree with the court below that a lower similarity standard applies to the plaintiffs' *LeClair* claims. Unlike the District Court, however, we conclude that the Amended Complaint satisfies this less stringent standard, albeit just barely, by alleging facts that plausibly show a reasonably close resemblance between the plaintiffs and a comparator who received more favorable treatment from the defendants. We therefore affirm the District Court's dismissal of the plaintiffs' *Olech* claim but vacate as to the *LeClair* claims.

15

### i. Legal Framework

We first articulated a theory of Equal Protection based on the selective enforcement of the law in *LeClair v. Saunders*, a case decided nearly four decades ago. 627 F.2d 606, 609–10 (2d Cir. 1980). To prevail on such a claim, a plaintiff must prove that "(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995) (quoting *FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir. 1992)). As this test makes clear, "[t]he *LeClair* type of equal protection claim requires proof of disparate treatment and impermissible motivation." *Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005). A plaintiff cannot merely rest on "a demonstration of different treatment from persons similarly situated[.]" *Id.* (quoting *Crowley v. Courville*, 76 F.3d 47, 53 (2d Cir. 1996)) (internal quotation marks and alterations omitted). Instead, he must "prove that the disparate treatment was *caused by* the impermissible motivation." *Id..* As evident from *LeClair*'s broad definition of "impermissible considerations," *LeClair* protects against both discrimination on the basis of a plaintiff's protected status (*e.g.*, race

16

or a constitutionally-protected activity) and discrimination on the basis of a defendant's personal malice or ill will towards a plaintiff. However, we have cautioned that the latter type of *LeClair* claim, unlike the former, is "lodged in a murky corner of equal protection law in which there are surprisingly few cases and no clearly delineated rules to apply." *Id.* at 86 (quoting *LeClair*, 627 F.2d at 608).

In *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam), the Supreme Court ventured into that murky corner and articulated what has become known as the "class of one" theory of Equal Protection. The plaintiff in that case sought to connect her property to a municipal water supply. *Id.* at 563. When the Village of Willowbrook conditioned its approval on the plaintiff granting it a 33-foot easement, the plaintiff brought suit on the grounds that the Village only required a 15-foot easement from other property owners seeking similar water access. *Id.* Although the plaintiff did "not allege membership in a class or group," the Supreme Court held that she could nonetheless state an Equal Protection claim by alleging "[1] that she has been intentionally treated differently from others similarly situated and [2] that there is no rational basis for the difference in treatment." *Id.* at 564. As the *Olech* Court explained, this cause

17

of action arises out of the Equal Protection Clause's "purpose . . . to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." *Id.* The Court did not reach the alternative theory that the Village harbored subjective ill will towards the plaintiff. Further, *Olech* declined to specify the degree of similarity required between a plaintiff and her comparator.

In *Neilson v. D'Angelis*, 409 F.3d 100 (2d Cir. 2005), we addressed that omission and set forth the Second Circuit's similarity standard for an *Olech* cause of action.[3] *See, e.g.*, *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010) (relying on *Neilson*'s articulation of the elements of an *Olech* claim); *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018) (same). We held that, "[i]n order to succeed on a 'class of one' claim, the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." *Neilson*, 409 F.3d at 104. More precisely, a plaintiff must establish that he and a comparator are "*prima facie* identical" by showing that "(i) no rational person could regard the circumstances of the

---

[3] Although we later overruled *Neilson* insofar as it allowed public employees to assert *Olech* claims against their government employers, *see Appel v. Spiridon*, 531 F.3d 138, 139 (2d Cir. 2008), we left intact *Neilson*'s articulation of the elements of an *Olech* claim, *see Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 n.1 (2d Cir. 2010).

18

plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Id.* at 105. We explained that the existence of highly similar circumstances provides the basis for "infer[ring] that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose – whether personal or otherwise – is all but certain." *Id.*

While we have made efforts to clarify the contours of an *Olech* claim, we have paid less attention to the interaction between *Olech* and *LeClair*. The precise relationship between these doctrines, however, has become a source of some confusion in the Circuit. *See 33 Seminary LLC v. City of Binghamton*, 670 F. App'x 727, 730 (2d Cir. 2016) (noting this confusion); *Gray v. Maquat*, 669 F. App'x 4, 5 n.1 (2d Cir. 2016) (same). On the one hand, we have suggested that *Olech* and *LeClair* offer two distinct Equal Protection theories of non-class-based discrimination, with *Olech* claims focused on whether the defendant's conduct was rationally related to a legitimate government policy and *LeClair* claims focused on whether the defendant's conduct was motivated by malice towards

19

the plaintiff. *See Bizzarro*, 394 F.3d at 86 (presenting *Olech* and *LeClair* as "two slightly different theories" of Equal Protection); *Cobb v. Pozzi*, 363 F.3d 89, 109 (2d Cir. 2004) (calling them "two related, yet different, equal protection arguments"). Periodically, however, we have raised the possibility that an *Olech* claim requires proof of a defendant's ill will towards the plaintiff, suggesting that *Olech* may have displaced or merged with *LeClair*'s Equal Protection theory of malice-based discrimination. *See Bizzarro*, 394 F.3d at 88 ("We have not resolved whether, in light of *Olech*, the theory espoused by *LeClair* remains the proper one in 'class of one' claims."); *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499–500 (2d Cir. 2001) (declining to reach the question of whether the "Supreme Court's decision in *Olech* modified the second part of the *LeClair* analysis by removing the requirement that malice or bad faith be shown in order to state a valid 'class of one' equal protection claim"); *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir. 2001) (same). As noted above, *Olech* has also sparked questions about the degree of similarity required in a *LeClair* claim. *See supra* at 14. While some district courts have applied *Neilson*'s similarity standard for *Olech* claims to *LeClair* claims, others have concluded that a lower similarity standard should apply. *See Mosdos Chofetz Chaim*, 815 F. Supp. 2d at 693–97 (collecting cases).

20

Today, we seek to resolve some of this uncertainty and clarify the relationship between *LeClair* and *Olech*. For the reasons that follow, we hold that these two decisions offer distinct pathways for proving a non-class-based Equal Protection violation. While both types of Equal Protection claims require a showing that the plaintiff was treated differently from another similarly situated comparator, they differ in at least two key respects. First, unlike a malice-based *LeClair* claim, an *Olech* claim does not require proof of a defendant's subjective ill will towards a plaintiff. Instead, a plaintiff can prevail on an *Olech* claim on the basis of similarity alone. However, the similarity standard for an *Olech* claim is more stringent than the standard for a *LeClair* claim. While *Olech* requires an "extremely high" degree of similarity between a plaintiff and comparator, *LeClair* merely requires a "reasonably close resemblance" between a plaintiff's and comparator's circumstances.

These holdings stem from both the Supreme Court's decision in *Olech* and our own subsequent precedent. To begin, we read *Olech* as rejecting the contention that malice is a requirement of a class of one Equal Protection claim. The majority opinion recognized that the plaintiff's complaint contained allegations that the Village's conduct was "motivated by ill will resulting from

21

[her] previous filing of an unrelated, successful lawsuit against the Village."

*Olech*, 528 U.S. at 563. It further acknowledged that the appellate court below had ruled in favor of the plaintiff on the basis of these allegations of subjective ill will. *Id.* at 563–64. Nevertheless, the Supreme Court expressly declined to adopt the circuit court's Equal Protection theory, *see id.* at 565, a theory that would have "require[d] proof that the cause of the differential treatment of which the plaintiff complains was a totally illegitimate animus toward the plaintiff by the defendant," *Olech v. Vill. of Willowbrook*, 160 F.3d 386, 388 (7th Cir. 1998). Instead, the majority in *Olech* focused on the allegations that the Village's demand for a 33-foot easement was "irrational and wholly arbitrary" given that the Village required only a 15-foot easement from other similarly situated property owners. *Olech*, 528 U.S. at 565. It held that "[t]hese allegations, quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis." *Id.* The Supreme Court therefore affirmed the appellate court's judgment, without "reach[ing] the alternative theory of 'subjective ill will' relied on by that court." *Id.* This choice is even more telling in light of Justice Breyer's concurrence in the case. Echoing concerns raised by the circuit court, Justice Breyer warned against interpreting the Equal Protection

22

Clause in a way that would "transform[ ] run-of-the-mill zoning cases into cases of constitutional right," and he justified his concurrence on the grounds that the plaintiff's allegations of "ill will" were "sufficient to minimize [this] concern[.]" *Id.* at 566.

Our reading of *Olech* finds support in Second Circuit caselaw. *See, e.g.*, *Harlen*, 273 F.3d at 499–500 (collecting cases that support this interpretation of *Olech*). Indeed, it appears that *Neilson* developed this Circuit's similarity standard for an *Olech* claim based on the assumption that *Olech* did not require a showing of malice. Specifically, *Neilson* derived its standard by comparing (1) a case where the plaintiff seeks to prevail on an *Olech* claim "based on similar circumstances *alone*," with (2) a case where the plaintiff claims "discrimination based on membership in a specific protected class." *Neilson*, 409 F.3d at 104–05 (internal quotation marks omitted, emphasis added). We noted that, to succeed in the latter case, a plaintiff must prove both that he was treated differently from another similarly situated, and that the differential treatment was motivated by the plaintiff's membership in a protected class. *Id.* at 105. In an *Olech* claim, by contrast, the existence of persons in similar circumstances is offered not only to show disparate treatment, but to also "provide an inference that the plaintiff was

23

intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose – whether personal or otherwise – is all but certain." *Id.* Thus, we distinguished *Olech* from the typical, class-based Equal Protection claim on the grounds that, in an *Olech* claim, the disparate treatment and impermissible motive inquiries are "virtually one and the same." *Id.* An *Olech* claim asserts that the distinction between the plaintiff's case and those similarly situated is so arbitrary and irrational that it fails to pass even the "minimal" equal protection standard: that distinctions among the objects of government action must be rationally related to a legitimate government objective. *See Kotch v. Bd. Of River Port Pilot Comm'rs for Port of New Orleans*, 330 U.S. 552, 564 (1947) (upholding a licensing scheme that disfavored persons not related to current river boat pilots based on possible efficiency and safety benefits of close ties among pilots).

On the basis of this analytical difference, we concluded that *Olech* claims, which "rel[y] on similarity alone," should be subjected to a more stringent similarity standard than class-based discrimination claims. *Neilson*, 409 F.3d at 106. To hold otherwise, we observed, would yield a "pervers[e]" outcome, namely: it would be easier for plaintiffs to plead an *Olech* claim than a race

24

discrimination case, "the core of equal protection[.]" *Id.* This is because, as noted above, race discrimination claims require proof of both disparate treatment and racial animus, while "[a] finding of general 'similarity' alone would do the trick in the 'class of one' case." *Id..* Because we were unwilling to take the law of Equal Protection down such a path, we set forth the "extremely high" similarity standard that has come to govern *Olech* claims in this Circuit, requiring a plaintiff to prove that "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Id.* at 104–05.

Today's opinion therefore validates the premise upon which this Circuit has constructed its standard for an *Olech* claim. *Olech*, unlike the malice-based theory of Equal Protection under *LeClair*, does not require proof of a defendant's subjective ill will towards the plaintiff. Instead, a plaintiff may prevail on an *Olech* claim based on *prima facie* identical circumstances alone. In reaching this conclusion, we are mindful of the concerns raised by Justice Breyer's concurrence about transforming "run-of-the-mill" enforcement actions into constitutional

causes of action. *Olech*, 528 U.S. at 566. We believe, however, that *Neilson*'s exacting similarity standard limits the risk that *Olech* "will create a flood of claims in that area of government action where discretion is high and variation is common." *Del Marcelle v. Brown Cty. Corp.*, 680 F.3d 887, 915 (7th Cir. 2012) (Wood, *J.*, dissenting).

We would also note that *Olech* has been cabined in other ways. Most notably, the Supreme Court in *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 594 (2008), barred public employees from bringing *Olech* claims against their government employers. The Court reasoned that some types of state action are so inherently discretionary that they are not suitable for an *Olech* cause of action. *Id.* at 603. In such situations, the *Engquist* Court explained, "allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise." *Id.* The Court found that "[t]his principle applies most clearly in the employment context, for employment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." *Id.* at 604. We have read *Engquist* as essentially "a jurisdiction-limiting decision" and, while we have declined to extend *Engquist*'s bar to "all class-of-one claims

26

involving discretionary state action," we have suggested that "there may be some circumstances where *Engquist* is properly applied outside of the employment context." *Analytical Diagnostic Labs*, 626 F.3d at 140, 142. We have noted, however, that *Engquist*'s limitation on "class of one" claims is more likely to apply when the state acts as a proprietor rather than as a regulator, reasoning that "[t]he government has significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large." *Id.* at 142 (internal quotation marks omitted). Admittedly, we have not found occasion to extend *Engquist* outside of the employment context. *See id.* at 142–43 (concluding that *Engquist* did not apply to a state system for issuing clinical testing laboratory permits); *Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012) (finding that *Engquist* did not apply to a town's zoning decisions). Nevertheless, our caselaw suggests that *Engquist* protects against the concern that, notwithstanding *Neilson*'s strict similarity standard, *Olech* will flood the courts with Equal Protection cases involving highly discretionary government action.

Having concluded that malice is not a requirement of an *Olech* claim, we now turn to the question of whether *Olech* and *LeClair* require the same degree of

27

similarity between a plaintiff and her proffered comparator. *Neilson* also supplies the answer to this second question. As explained above, *Neilson* applied a higher similarity standard to *Olech* claims than to claims for race discrimination because plaintiffs pursuing the latter claims had the extra burden of proving that their negative treatment was caused by an impermissible motive. *See supra* at 23–24. That same logic, however, counsels in favor of applying a lower similarity standard to *LeClair* claims than to *Olech* claims, because *LeClair* also requires plaintiffs to not only demonstrate that they have been treated differently from another similarly situated comparator but that "the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Zahra*, 48 F.3d at 683 (quoting *FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir. 1992).

We therefore analyze the first element of a *LeClair* claim under the similarity standard that we articulated in *Graham v. Long Island Rail Road*, 230 F.3d 34 (2d Cir. 2000), and that we have since used in a variety of contexts to determine whether a plaintiff's disparate treatment "raise[s] an inference of

28

discrimination." *Id.* at 39 (Title VII discrimination claim); *see also Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001) (section 1981 discrimination claim); *Men of Color Helping All Soc., Inc. v. City of Buffalo*, 529 F. App'x 20, 26 (2d Cir. 2013) (Equal Protection claim). To satisfy this standard, "the plaintiff's and comparator's circumstances must bear a reasonably close resemblance." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (internal quotation marks omitted). They need not, however, be "identical." *Id.* A plaintiff can prevail by showing that "she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Graham*, 230 F.3d at 39 (internal quotation marks omitted).

With these standards in mind, we now address whether the District Court properly dismissed the plaintiffs' *Olech* claim, malice-based *LeClair* claim, and race-based *LeClair* claim for failure to plausibly allege a similarly situated comparator.

ii. <u>Application</u>

The Amended Complaint identifies three specific comparators relating to the plaintiffs' jobsites at (1) 139-20 34th Avenue, Flushing New York ("the 34th Avenue Jobsite"); (2) 43-05 162nd Street, Flushing New York ("the 43-05 Jobsite"); and (3) 542 West 22nd Street, New York ("the West 22nd Jobsite"). In

addition, the plaintiffs rely on statistics concerning Burkart's enforcement practices to show that they have been treated differently than similarly situated non-Asians. For the reasons discussed below, only the 34th Avenue Jobsite plausibly satisfies the lower similarity standard of a *LeClair* claim – albeit, barely. None of the proffered comparators, however, satisfy the more stringent similarity requirements of an *Olech* claim. Thus, because *Olech* and *LeClair* both require the plaintiffs to plausibly plead at least one similarly situated comparator, we affirm the District Court's dismissal of the plaintiffs' *Olech* claim but vacate as to their *LeClair* claims for race-based and malice-based discrimination.

### a. *LeClair* Claims

The first proffered comparator concerns work conducted at the 34th Avenue Jobsite. Specifically, the plaintiffs allege that Burkart issued them a violation "for having a pool of water" on the 34th Avenue Jobsite. Hu Appx. at A37 ¶ 190. Later, Burkart returned to the location when white workers were performing work on the jobsite. Even though these white workers were also working next to a pool of water, Burkart did not issue them a notice of violation or otherwise interrupt their work. Instead, Burkart reserved "such negative treatment for Asian workers." *Id.* at A39 ¶ 202.

30

The District Court concluded that these allegations were "suggestive" but "not sufficient to show that any of the plaintiffs were similarly situated to these white workers in *all* material respects." *See* Hu Appellants' Special Appendix ("District Court Ruling") (Doc. No. 42), Case No. 18-737-cv at SPA16. In arriving at this outcome, the lower court faulted the plaintiffs for failing to allege sufficient details about the circumstances surrounding the violation, "such as how deep the standing water was, how long it had been sitting at the site, or whether there were other violations at the job site." *Id.*

To survive a motion to dismiss, however, the plaintiffs' Amended Complaint "need not contain 'detailed factual allegations[.]'" *Matson v. Bd. of Educ. of City Sch. Dist. of New York*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While the plaintiffs must plead factual allegations that "raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), *Twombly* and *Iqbal* "*do not require heightened fact pleading of specifics*, but only enough facts to state a claim to relief that is plausible on its face." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). So long as a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,"

31

*Iqbal*, 556 U.S. at 678, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely," *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

The plaintiffs in this case have satisfied the standard of plausibility by alleging differential treatment by the same defendant (Burkart) for the same conduct (having a pool of standing water) at the same jobsite (the 34th Avenue Jobsite). While these allegations are admittedly few in number, they nonetheless allow us to plausibly infer "a reasonably close resemblance" between the plaintiffs and the white workers. Discovery in this case may ultimately confirm the District Court's suspicions that water depth, the existence of other building code violations, the outstanding violation for the same condition, or any number of on-site characteristics render the resemblance between the plaintiffs and the white workers less than "reasonably close." *Graham*, 230 F.3d at 40. At this early stage in the litigation, however, the plaintiffs' failure to plead such fact-specific details should not bar their *LeClair* claims.

We recognize, of course, that "[t]here is no precise formula to determine whether an individual is similarly situated to comparators." *McDonald v. Vill. of*

*Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004); *Lindquist v. City of Pasadena Texas*, 669 F.3d 225, 234 (5th Cir. 2012) ("[T]he inquiry is case-specific and requires us to consider the full variety of factors that an objectively reasonable decisionmaker would have found relevant in making the challenged decision.") (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1203 (11th Cir. 2007) (internal quotation marks and alterations omitted)).  The question of "whether parties are similarly situated is [generally] a fact-intensive inquiry" that depends heavily on the particular context of the case at hand.  *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006); *see also Jennings v. City of Stillwater*, 383 F.3d 1199, 1214 (10th Cir. 2004) ("Inevitably, the degree to which others are viewed as similarly situated depends substantially on the facts and context of the case.").  However, it is precisely in light of the inquiry's fact-intensive nature that we have cautioned against deciding whether two comparators are similarly situated on a motion to dismiss. *See Brown*, 756 F.3d at 230 ("Ordinarily, whether two employees are similarly situated presents a question of fact, rather than a legal question to be resolved on a motion to dismiss." (internal quotation marks and alterations omitted)); *cf. Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) ("[M]arket definition is a deeply fact-intensive inquiry and courts therefore

hesitate to grant motions to dismiss for failure to plead a relevant product market . . . ." (internal quotation marks and alterations omitted)).

On appeal, the defendants raise four additional arguments in favor of dismissal, none of which is availing. First, the defendants fault the Amended Complaint for not expressly alleging that there were Asian workers at the 34th Avenue Jobsite when Burkart issued the violation for the pool of water. While the defendants are technically correct, other factual allegations in the Amended Complaint provide a basis for reasonably inferring that Burkart issued the violation when Asian workers were working on the site. For example, the Amended Complaint alleges that "Burkart issued a violation [to the plaintiffs], though, as discussed below, he did not issue one when non-Asian workers were performing work in and around the same standing water." Hu Appx. at A37 ¶ 192. The plaintiffs' description of the white workers as "non-Asian" supports the inference that the workers who were present when Burkart issued his violation were Asian. This inference is bolstered by the allegation that Burkart "reserved such negative treatment [*i.e.*, the issuance of a violation] for Asian workers," *id.* at A39 ¶ 202, which allegation in essence states that the violation was issued when the workers on the site with the pool of water were Asian. When these

34

allegations are combined with the fact that the plaintiffs are an Asian worker and Asian-owned companies, they create the plausible inference that Burkart issued a violation for the pool of water when Asian workers were working at the 34th Avenue Jobsite, but declined to issue a violation for the same pool of water when white workers were working at the location.

Second, the defendants argue that the white workers cannot be similarly situated to NY Drilling or 888 Consulting because individuals cannot be similarly situated to corporate entities. However, they offer no explanation or caselaw in support of this assertion, and it is not clear to us why corporate form is material to the similarly situated analysis in this case. According to the plaintiffs' theory of discrimination, NY Drilling and 888 Consulting are being unfairly targeted because Burkart has identified them as "Asian" construction companies that work closely with Hu. Thus, from Burkart's perspective, it is not the plaintiffs' corporate form that materially distinguishes them from other entities working in the construction industry. Instead, it is the fact that these corporate plaintiffs are owned and controlled by Asians and have close associations with Hu. Said another way, the defendants discriminate against NY Drilling and 888 Consulting based on the identities of these companies' employees and business

35

associates. Indeed, it can be reasonably inferred from the Amended Complaint that the defendants use the presence of Asian workers to identify and target jobsites that are being run by these plaintiffs. *See* Hu Appx. at A44 ¶ 249 ("Plaintiffs have been forced to put Caucasian people in positions whereby they interact with inspectors, so as to facilitate lifting of [stop work orders] and releasing of permits."). Thus, because NY Drilling and 888 Consulting are being adversely targeted based on the race and identities of their owners and workers, they can prove their discrimination claim by showing that their Asian employees have been treated differently from similarly situated non-Asian workers.

Third, the defendants fault the plaintiffs for not citing the specific provision of the building code that they and the white workers allegedly violated by having a pool of water at the 34th Avenue Jobsite. Although this is true, the plaintiffs do allege the precise conduct forming the basis of their alleged violation of the building code, *i.e.*, performing construction work at a jobsite that has a pool of water. Drawing all inferences in favor of the plaintiffs, a reasonable juror could infer from the Amended Complaint that the white workers violated

the same building code provision that the plaintiffs allegedly did by engaging in the same conduct at the same jobsite.[4]

Finally, the defendants argue that the 34th Avenue Jobsite cannot serve as a comparator because NY Drilling was the general contractor on the site and therefore responsible for any violation issued to that location, regardless of whether the violation sanctioned the plaintiffs' workers or the white workers. The defendants speculate that, if Burkart was, in fact, targeting the plaintiffs, he would have also sanctioned the white workers for the pool of water, presumably knowing that such a sanctioning would ultimately hurt NY Drilling. This argument, however, assumes facts that are not found in the Amended Complaint. The plaintiffs do not allege that NY Drilling was the general contractor on the 34th Avenue Jobsite. Nor does the Amended Complaint allege that any violation issued at a jobsite is issued to the jobsite's general contractor, as opposed to the jobsite's subcontractors. Instead, the Amended Complaint

---

[4] As support for their assertion that the plaintiffs must identify the specific Building Code provision that was violated by having a pool of water on the Jobsite, the defendants cite to the Fifth Circuit's decision in *Lindquist v. City of Pasadena Texas*, 669 F.3d 225, 234 (5th Cir. 2012), which decision held that, in a case that "involves the application of an ordinance or statute, the plaintiff's and comparators' relationships with the ordinance at issue will generally be a relevant characteristic for purposes of the similarly-situated analysis." However, *Lindquist* was decided at the summary judgment stage, not on a motion to dismiss. *Id.* at 227. Here, at the pleading stage, it can reasonably be inferred from the factual allegations of the Amended Complaint that the white workers and the plaintiffs violated the same building code provision by engaging in the same conduct at the same jobsite.

merely alleges that the plaintiffs were issued a notice of violation for performing work on a jobsite with a pool of water.  To assume that NY Drilling was responsible for all violations issued at the 34th Avenue Jobsite, including any violation that could have been issued to the white workers, would be drawing inferences against the plaintiffs.

Admittedly, the question of whether these factual allegations plausibly support a *LeClair* claim is a close one.  The plaintiffs have certainly not made it easy for this court to conclude that they bear a reasonably close resemblance to the white workers at the 34th Avenue Jobsite.  Nevertheless, drawing all inferences in favor of the plaintiffs, and resolving all ambiguities against the defendants, we conclude that these allegations are sufficient to satisfy the "reasonably close resemblance" standard of similarity that governs the plaintiffs' race-based and malice-based *LeClair* claims.

The plausibility of their claims is strengthened by the Amended Complaint's allegations of racial bias against Asians and personal malice against Hu, including the allegations that, *inter alia*, Burkart made explicitly racist comments; had a racist motive to discriminate against Asians; statistically gave more violations to Asian construction sites than did his colleagues; bragged

about his plans to shut down Hu's jobsites; called Hu "a rat" for reporting a colleague to the FBI; hung a picture of Hu on his wall; and specifically searched DOB's databases for construction worksites that employed Hu. These allegations satisfy the motive element of *LeClair* and help "nudge" the plaintiffs' Equal Protection claims "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570). Accordingly, we vacate the District Court's dismissal of the plaintiffs' *LeClair* selective enforcement claims of race-based and malice-based discrimination.[5]

### b. *Olech* Claim

In contrast, none of the plaintiffs' proffered comparators satisfy the more stringent similarity standard for an *Olech* claim.

With regard to the 34th Avenue Jobsite, the plaintiffs' factual allegations are too sparse to raise a reasonable inference that Burkart's differential treatment of the plaintiffs and the white workers "lack[ed] any reasonable nexus with a

---

[5] We have not decided whether the Supreme Court's decision in *Engquist* to bar *Olech* claims in the employment context also applies to malice-based *LeClair* claims. *See Spanierman v. Hughes*, 576 F. Supp. 2d 292, 307 (D. Conn. 2008) (noting this uncertainty). We need not, and do not, resolve this issue today. Assuming *arguendo* that *Engquist* does apply to malice-based *LeClair* claims, it would not preclude the plaintiffs from raising this type of claim in the present suit. As in other cases where we have concluded that *Engquist* did not bar a class of one claim, this case involves (1) the state acting as a sovereign rather than a proprietor; and (2) the defendants operating within a regulatory framework (*i.e.*, the building code) that articulates clear standards of conduct, limits their discretion, and provides mechanisms for challenging and reviewing their determinations (*i.e.*, an Article 78 proceeding). *See Analytical Diagnostic Labs*, 626 F.3d at 142; *Fortress Bible Church*, 694 F.3d at 222.

legitimate governmental policy." *Progressive Credit Union*, 889 F.3d at 49 (quoting *Neilson*, 409 F.3d at 105) (internal alterations omitted). The Amended Complaint is silent as to a whole host of potential factors that could legitimately justify Burkart's behavior, including, *inter alia*, whether the white workers were engaged in the same type of work as the plaintiffs, the length of time between Burkart's visits to the 34th Avenue Jobsite, and the identity of the white workers' employer. While we are not suggesting that any one of these omissions is dispositive, they are, together, fatal to the plaintiffs' *Olech* claim. Absent the non-conclusory allegations that Burkart had a race-based animus against Asians and a personal grudge against Hu, it could not reasonably be inferred that the two situations were so identical as to "exclude the possibility that [Burkart] acted on the basis of a mistake." *Id.*

The plaintiffs' second proffered comparator fares no better. In particular, the plaintiffs allege that Burkart permitted Vera Construction, a non-Asian company, to complete foundation work at the 43-05 Jobsite, but then promptly shut down work at that location once 43 162 St. Management, an Asian company, became responsible for the construction site. The Amended Complaint, however, is devoid of facts suggesting that the plaintiffs worked at or were

40

otherwise involved with the 43-05 Jobsite. Thus, notwithstanding the plaintiffs' conclusory assertions that they are similarly situated to Vera Construction and its owner, Burkart's conduct at the 43-05 Jobsite does not raise a plausible inference that Burkart treated the plaintiffs differently from Vera Construction. Thus, while this incident may tend to prove that Burkart was biased against Asians generally, it does not show that the *plaintiffs* were adversely affected by that bias. The 43-05 Jobsite therefore provides no basis for reversing the District Court's dismissal of the plaintiffs' *Olech* claim, as a comparator only satisfies the pleading requirements of that claim if the comparator "received more favorable treatment than the plaintiff." *Neilson*, 409 F.3d at 105.

The plaintiffs' third proffered comparator fails for the same reason. More specifically, the plaintiffs compare DOB's lenient treatment of Westerman Construction Company ("Westerman"), a non-Asian contractor who oversaw the West 22nd Jobsite, with DOB's harsher treatment of certain unnamed "Asian construction professionals" who owned and operated a second jobsite located at 20-16 College Point Boulevard, College Point, New York ("the College Point Jobsite"). *See* Hu Appx. at A41 ¶ 221 – A43 ¶ 244. However, the plaintiffs do not allege that they worked at or were involved with the College Point Jobsite.

41

Accordingly, there are no factual allegations to suggest that the plaintiffs were adversely affected by DOB's differential treatment of the two construction sites. If anything, it appears that the plaintiffs were on the benefiting end of DOB's selective enforcement, as NY Drilling allegedly worked as a subcontractor at the West 22nd Jobsite.

Finally, we reject the plaintiffs' contention that they can satisfy the similarly situated standard based on a statistical showing that Burkart sanctioned Asians at higher rates than his colleagues did. Our caselaw makes clear that statistics cannot substitute for specific comparators in *Olech* or *LeClair* claims. *See Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (dismissing an *Olech* claim for failure to "allege specific examples" of similarly situated comparators); *Albert v. Carovano*, 851 F.2d 561, 573 (2d Cir. 1988) ("To support a claim of selective enforcement, appellants must allege purposeful and systematic discrimination by specifying instances in which they were singled out for unlawful oppression in contrast to others similarly situated." (internal quotation marks and alterations omitted)). To prevail under either theory of Equal Protection, a plaintiff must specify at least one instance in which he was treated differently from another similarly situated. *See Neilson*, 409 F.3d at 105

(holding that a plaintiff must identify "a comparator" whose circumstances are sufficiently similar). Thus, because none of the plaintiffs' proffered comparators satisfy the similarity standard for an *Olech* cause of action, we affirm the District Court's dismissal of that claim.

C.    Section 1981 Claim

For the same reasons that we vacate the District Court's dismissal of the plaintiffs' *LeClair* claims, we vacate its dismissal of the plaintiffs' section 1981 claim for race-based interference with the plaintiffs' rights to make and enforce contracts. As the District Court correctly noted, "plaintiffs must meet the same pleading standard for their § 1981 claims as for their § 1983 claims under the Equal Protection Clause." *Brown v. City of Oneonta, New York*, 221 F.3d 329, 339 (2d Cir. 2000). Thus, to prevail on a section 1981 claim, a plaintiff must allege at least one instance in which he was treated differently from a similarly situated non-minority. *Id.* (citing *Albert*, 851 F.2d at 573). The section 1981 standard for determining whether a plaintiff and a comparator are similarly situated is identical to the similarity standard for a *LeClair* Equal Protection claim. *Compare supra* at 28–29, *with Lizardo*, 270 F.3d at 101 (section 1981 race discrimination claim).

43

Recognizing these parallels, the District Court dismissed the plaintiffs'

section 1981 claim for the same reason that it dismissed their Equal Protection

claims, namely, failure to plausibly allege differential treatment of a similarly

situated comparator. We now vacate, on that issue, having concluded that the

Amended Complaint does, in fact, state an Equal Protection claim under *LeClair*.[6]

D. <u>Due Process Claim</u>

The plaintiffs' Due Process claim proceeds under two theories. First, they

argue that the defendants' discriminatory enforcement practices have deprived

them of their right to pursue their occupation of choice, namely, construction

work. Second, they rely on our decision in *Chalfy v. Turoff*, 804 F.2d 20 (2d Cir.

1986), to assert a "pattern of harassment" claim, alleging that the defendants

have engaged in systematic and intentional harassment with the objective of

driving the plaintiffs out of business. *See* Appellants' Brief ("Pls.' Mem.") (Doc.

---

[6] We decline to consider whether the Amended Complaint plausibly alleges the other elements of a section 1981 claim, including whether the defendants' conduct interfered with the making and enforcement of contracts. *See Brown*, 221 F.3d at 339 ("To establish a claim under 42 U.S.C. § 1981, plaintiffs must allege facts supporting the following elements: (1) plaintiffs are members of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities."). Instead, the District Court should address these issues in the first instance if they arise on remand. *See Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 418 (2d Cir. 2001) ("In general, a federal appellate court does not consider an issue not passed upon below." (internal quotation marks omitted)).

44

No. 39), Case No. 18-737, at 51–54. The District Court dismissed both claims, and we now affirm.

As to the first theory, it is well established that "the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment." *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999). That right, however, is "subject to reasonable government regulation." *Id.* at 292. "[B]rief interruption[s]" of work do not give rise to a Due Process claim. *Id.* Instead, the Supreme Court, this Circuit, and the other Circuits addressing the issue have all indicated that the right of occupational choice is afforded Due Process protection only when a plaintiff is "complete[ly] prohibit[ed]" from engaging in his or her chosen profession. *Id.* ("These cases all deal with a complete prohibition of the right to engage in a calling, and not the sort of brief interruption which occurred here."); *United States v. Farhane*, 634 F.3d 127, 137 (2d Cir. 2011) (reading *Conn* to imply that "due process is violated only by complete prohibition of the right to engage in a calling" (internal quotation marks omitted)); *see also, e.g.*, *Singleton v. Cecil*, 176 F.3d 419, 426 n.8 (8th Cir. 1999) ("The [*Conn*] Court then made clear that this right has been afforded substantive due process protection only when the

45

government completely prohibits, rather than briefly interrupts, a person from engaging in his desired occupational field." (internal quotation marks and alterations omitted)); *Lowry v. Barnhart*, 329 F.3d 1019, 1023 (9th Cir. 2003) ("This indirect and incidental burden on professional practice is far too removed from a complete prohibition to support a due process claim.").

In this case, the plaintiffs allege that the defendants' enforcement actions have cost them money, clients, and future business opportunities. However, business losses alone do not implicate the Due Process right of occupational choice. *See JWJ Indus., Inc. v. Oswego Cty.*, 538 F. App'x 11, 14 (2d Cir. 2013) ("Due process has not been construed to preclude government actions that adversely affect a business's profitability."). To prevail on such a claim, a plaintiff must allege facts suggesting that a defendant's conduct has "operate[d] as a complete prohibition on his ability to practice [his chosen profession]." *Franceschi v. Yee*, 887 F.3d 927, 938 (9th Cir.), *cert. denied*, 139 S. Ct. 648 (2018). Nothing in the Amended Complaint plausibly suggests that the plaintiffs have been driven out of the construction business, or even that they are on the verge of shutting down. If anything, the Amended Complaint appears to anticipate the plaintiffs' continued operations in the construction industry. *See* Hu Appx. at A44 ¶ 256

46

("Burkart and the Inspector Defendants are not only causing Hu to lose current income streams, but are also damaging his reputation, which will lead to further future losses.").

Nor can the plaintiffs create a Due Process claim by alleging that it is Burkart's "objective" to put them out of business. *See* Pls.' Mem. at 50. When determining whether a burden amounts to a complete prohibition of the right to engage in a calling, courts have focused on the effects of a defendant's conduct, not on the intentions underlying that conduct. *See, e.g., Lowry*, 329 F.3d at 1023 (discussing the degree to which the defendant's conduct interfered with the plaintiffs' professional practice); *Grider v. Abramson*, 180 F.3d 739, 752 n.17 (6th Cir. 1999) (same). The concept of "complete prohibition" will not stretch so far as to cover cases where, as here, the defendant's mal-intent is clear but the actual risk that the plaintiff will be excluded from her profession of choice is speculative. Thus, because the plaintiffs did not allege facts suggesting that the defendants have effectively prohibited them from engaging in construction work, we affirm the District Court's dismissal of the plaintiffs' Due Process claim for infringement of their right of occupational choice.

As to their second theory of Due Process, the plaintiffs rely on our decision in *Chalfy*, in which we suggested that a plaintiff could make out a substantive Due Process claim by showing that government officials engaged in systematic and intentional harassment in an attempt to drive the plaintiff out of business. *See Chalfy*, 804 F.2d at 22–23; *see also Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 144 (2d Cir. 1994) (characterizing *Chalfy* as a theory of substantive Due Process). While we have not revisited this "pattern of harassment" theory of Due Process since deciding *Chalfy*, district courts in this Circuit have continued to treat it as a viable cause of action. *See, e.g.*, *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 719 (S.D.N.Y. 2012) (denying the defendants' motion to dismiss as to some of the plaintiffs' *Chalfy* claims).

In this case, the District Court dismissed the plaintiffs' *Chalfy* claim on the grounds that the enforcement actions described in the Amended Complaint did not rise to the level of systematic and intentional harassment. We affirm the dismissal on different grounds, concluding that the plaintiffs' substantive Due Process claim is subsumed by their Equal Protection claim.

In the years following our decision in *Chalfy*, the Supreme Court narrowed the scope of substantive Due Process to claims that are not covered by other

48

provisions of the Constitution. *See Graham v. Connor*, 490 U.S. 386, 394–95 (1989) (holding that excessive force claims should be analyzed under the Fourth Amendment, rather than under substantive Due Process); *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality) (limiting the scope of substantive Due Process to claims that do not have "an explicit textual source of constitutional protection"); *Conn*, 526 U.S. at 293 (same). It is now well established that, "[w]here another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process." *Southerland v. City of New York*, 680 F.3d 127, 142–43 (2d Cir. 2012) (quoting *Kia P. v. McIntyre*, 235 F.3d 749, 757–58 (2d Cir. 2000)). In this case, the plaintiffs' *Chalfy* claim and Equal Protection claim both rest on the same set of factual allegations, namely: that Burkart and his colleagues selectively enforced the building code against the plaintiffs based on Burkart's racial animus towards Asians and his personal animus towards Hu. As a result, the plaintiffs' substantive Due Process allegations are subsumed by their more particular allegations of Equal Protection violations. *See Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005) (holding that the plaintiff's substantive due process claim was subsumed by the alleged First

49

Amendment and Equal Protection violations); *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1351 n.8 (2d Cir. 1994) (dismissing a plaintiff's substantive Due Process claim because it was duplicative of the plaintiff's Equal Protection claim); *see also Wilson v. Birnberg*, 667 F.3d 591, 599 (5th Cir. 2012) (disregarding the plaintiff's substantive due process claims because they were "rooted in procedural due process, the Equal Protection Clause, and the First Amendment"). We therefore affirm the District Court's dismissal of the *Chalfy* claim on different grounds, concluding that this claim must be analyzed under the Equal Protection Clause.[7]

### E.    Monell Claim

We also affirm the dismissal of the plaintiffs' *Monell* claim against the City, concluding, as the lower court did, that the plaintiffs have not plausibly alleged the existence of an official municipal policy.

To bring a section 1983 lawsuit for municipal liability, "a plaintiff must prove that action pursuant to official municipal policy caused the alleged constitutional injury." *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011)

---

[7] In reaching this outcome, we do not mean to suggest that *Chalfy* is a dead letter. There may be situations in which a *Chalfy* claim is not covered by an explicit provision of the Constitution. However, on the factual allegations presented in this case, we conclude that the plaintiffs' *Chalfy* claim for intentional and systematic government harassment is precluded by their Equal Protection claims.

50

(internal quotation marks omitted). This requirement follows from the principle that, "under § 1983, local governments are responsible only for their *own* illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal quotation marks omitted). In other words, "a city cannot be held liable under § 1983 on a theory of *respondeat superior*." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004). Instead, "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (internal quotation marks omitted).

An official municipal policy can take a variety of forms. *See, e.g., Cash*, 654 F.3d at 334 ("A municipal policy may be pronounced or tacit and reflected in either action or inaction."). This case, however, only implicates two theories of municipal action, namely: (1) that a policymaking officer ratified the discriminatory enforcement practices of Burkart and his colleagues; and (2) that these unconstitutional practices were so widespread, persistent, and manifest as to imply constructive acquiescence on the part of the City.

To prevail on the first theory, a plaintiff must allege facts suggesting that an officer with final policymaking authority ordered, ratified, or "was aware of a

51

subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Amnesty Am.*, 361 F.3d at 126. A plaintiff need only identify one such decision to bring a *Monell* claim, for "even a single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered may deprive the plaintiff of his or her constitutional rights." *Montero v. City of Yonkers, New York*, 890 F.3d 386, 403 (2d Cir. 2018) (internal quotation marks and alterations omitted). The question of whether an official "possessed final policymaking authority is a legal question, which is to be answered on the basis of state law, . . . includ[ing] state and local positive law, as well as custom or usage having the force of law." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (internal quotation marks, citations, and alterations omitted).

As support for their ratification theory of municipal action, the plaintiffs point to Hu's 2011 meeting with Burkart, an unnamed aide to a New York City Councilman, and Inspector Kaleid, the head of the Concrete Enforcement Unit ("CEU") at the time. During this meeting, Inspector Kaleid allegedly dismissed Hu's concerns about Burkart's targeting of Asian construction workers and companies, stating that "[Burkart] is good for the City because he generates a lot

of revenue through his issuance of notices of violation."  Hu Appx. at A25 ¶ 83.

The plaintiffs contend that Inspector Kaleid's response amounted to a

"ratification [that] gave license for DOB Inspectors to engage in such

misconduct[.]"  Appellants' Reply Brief (Doc. No. 76), Case No. 18-737, at 23.

Nothing in the Amended Complaint, however, suggests that Inspector

Kaleid possessed final policymaking authority over Burkart's enforcement

practices.  The plaintiffs themselves appear to acknowledge in their Amended

Complaint that New York law vests DOB Commissioner Chandler, not Inspector

Kaleid, with final policymaking authority over DOB enforcement practices.

There is no basis in the Amended Complaint for concluding that custom or usage

imbued Inspector Kaleid with such authority.  Nor is there a basis for attributing

Inspector Kaleid's dismissal of Hu's grievances to Commissioner Chandler.

Indeed, the Amended Complaint is devoid of factual allegations suggesting that

Commissioner Chandler was personally involved in, or aware of, the 2011

meeting, Burkart's discriminatory enforcement practices, or any other

unconstitutional actions taken by DOB's subordinate officers.[8]  As a result, the

---

[8] The Amended Complaint also alleges in conclusory terms that the City and Chandler "were [ ] on notice" due to Hu's complaint to the FBI regarding Dabusco.  Hu Appx. at A60 ¶ 352.  The plaintiffs do not press this argument on appeal, which, in any event, has no merit.  It cannot be reasonably inferred that Hu's FBI complaint, which alleged that Dabusco was engaging in extortion, put the City on notice

plaintiffs have not raised a plausible inference that their constitutional injuries were caused by a City official with final policymaking authority.

The plaintiffs' second theory of municipal action seeks to hold the City liable based on constructive notice. While "isolated acts by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify liability," we have recognized that "they can be the basis of liability if they . . . were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisors must have been aware." *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (internal quotation marks and alterations omitted). To prevail on such a theory of *Monell* liability, a plaintiff need not identify an express rule or regulation that embodies the alleged unconstitutional practice among subordinate municipal employees. *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006). However, the plaintiff must show that "the alleged practice [was] so manifest as to imply the constructive acquiescence of senior policy-making officials." *Id.* (internal quotation marks omitted).

---

that other DOB officials were targeting the plaintiffs for unwarranted building code violations on the basis of race and personal animus.

54

The allegations of misconduct in this case do not rise to such a level. The Amended Complaint only identifies four instances in which the plaintiffs were alleged to have been unfairly sanctioned by DOB. Although the plaintiffs argue that these specific enforcement actions are illustrative of a larger pattern of unconstitutional targeting, they do not allege facts to suggest that this larger pattern of targeting qualifies as widespread, persistent, or otherwise manifest behavior.

Similarly, while the plaintiffs claim that Burkart enlisted the help of other DOB employees to target and harass the plaintiffs, the Amended Complaint does not allege how many DOB employees were involved in the scheme, whether these accomplices represented a large or small share of DOB inspectors or personnel, the frequency with which these accomplices assisted in discriminatory enforcement practices, or any other facts that might indicate the extent to which DOB personnel helped Burkart carry out his alleged personal vendetta against Hu and other Asians in the construction industry. As a result, it is entirely unclear whether DOB's targeting of the plaintiffs is the product of a few rogue officials, a department-wide effort, or something in between.

Likewise, the allegations that Burkart made racist remarks do not raise a plausible inference that senior policymaking officers should have known of the discriminatory enforcement practices. While the Amended Complaint alleges that Burkart has been overheard harassing Asian workers, calling Hu a rat, and bragging about his plans to drive the plaintiffs out of business, it is silent as to the number and identities of the listeners. As a result, there is no basis for concluding that these remarks were made "with sufficient frequency or in such a manner that the attitude would have been known to supervisory personnel." *Jones v. Town of East Haven*, 691 F.3d 72, 82 (2d Cir. 2012). Similarly, while Burkart's dislike of Hu and Asians may have been an open secret among construction industry professionals, there are no factual allegations to suggest that Burkart communicated this attitude directly to senior policymaking officers or in a manner that should have made senior policymaking officers aware of his discriminatory animus.

In short, the Amended Complaint provides no basis for concluding that the defendants' discriminatory enforcement actions against the plaintiffs "represent[ed] the conscious choices of the municipality itself." *Amnesty Am.*, 361 F.3d at 126. While it can reasonably be inferred that the plaintiffs have been

56

the victims of persistent harassment by several subordinate officers at DOB, the factual allegations do not "compel[ ] the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). Accordingly, we affirm the District Court's dismissal of the plaintiffs' *Monell* claim.[9]

F.      Dismissal with Prejudice

Finally, the plaintiffs argue that, even if the District Court properly dismissed their federal claims under Rule 12(b)(6), it erred by dismissing those claims with prejudice. It is true that, in general, courts should "freely give leave" to amend pleadings "when justice so requires." Fed. R. Civ. P. 15(a)(2). However, we have also held that "no court can be said to have erred in failing to grant a request that was not made." *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir.

---

[9] The plaintiffs attempt to blame the defendants for any insufficiencies in their *Monell* claim, arguing that the defendants have not timely responded to the freedom of information requests that they made pursuant to New York law. We are not persuaded by this argument. As the alleged victims of the defendants' discriminatory targeting, the plaintiffs presumably possessed information on the number and types of sanctions and violations that they have received over the years. Nevertheless, their Amended Complaint fails to describe, in even general terms, the overall volume and frequency of enforcement actions taken against the plaintiffs. Moreover, even if the plaintiffs did not personally keep records of this information, they conceded at oral argument that DOB posts building code violations on its website. Thus, the plaintiffs do not face the situation where the facts that they need to plead their *Monell* claim "are peculiarly within the possession and control of the defendant[.]" *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018) (internal quotation marks omitted); *see also Amnesty Am.*, 361 F.3d at 130 n.10 (noting that, on a motion to dismiss a *Monell* claim for failure to train, a plaintiff is not required to "identify a specific deficiency in the [ ] training program or to establish a causal link between the lack of training and the misconduct [because] [i]t is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage[.]").

2011); *see also Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249–50 (2d Cir. 2004) ("[The] contention that the District Court abused its discretion in not permitting an amendment that was never requested is frivolous."). Because the plaintiffs in this case never requested leave to amend their Amended Complaint, the District Court did not err in declining to *sua sponte* grant leave to amend. We therefore affirm the lower court's decision to dismiss with prejudice the plaintiffs' *Olech* claim, Due Process claim, and *Monell* claim.[10]

### G.   State Claim

The District Court declined to exercise supplemental jurisdiction over the plaintiffs' state tax claim on the grounds that it had dismissed all of their federal claims. Having reinstated the plaintiffs' *LeClair* claims, we vacate the District Court's decision to remand the state claim to state court. On remand, the District Court may reconsider whether to exercise supplemental jurisdiction in light of the new posture of the case.

---

[10] On appeal, the plaintiffs also argue that the District Court erred by not permitting them to conduct jurisdictional discovery. This argument, however, is frivolous because the plaintiffs never made such a request to the District Court. Moreover, based on the plaintiffs' description of the discovery that they seek to elicit from the defendants, it appears that the plaintiffs seek discovery on the merits of their claims, rather than on jurisdictional issues.

**V.    CONCLUSION**

For the foregoing reasons, the judgment below is AFFIRMED in part insofar as the District Court dismissed the plaintiffs' *Olech* claim, Due Process claim, and *Monell* claim.  It is VACATED in part insofar as the District Court dismissed the plaintiffs' section 1981 claim and their Equal Protection claims under *LeClair* for race-based and malice-based selective enforcement.  We VACATE the District Court's decision to decline to exercise supplemental jurisdiction over the plaintiffs' state law claim, and we REMAND this case for further proceedings consistent with this opinion.